[Cite as *In re R.B.*, 2023-Ohio-3145.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| R.B. | : | CASE NO. CA2023-03-032 |
| | : | O P I N I O N<br>9/7/2023 |
| | : | |
| | : | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20-D000083

Clouse Law Firm Co., LPA, and Lauren L. Clouse, for Father.

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Dearie, Fischer & Martinson, LLC, and John A. Fischer, for appellant.

The Logsdon Law Office, LLC, and Brooke L. Logsdon, for CASA.

**BYRNE, J.**

{¶ 1} Appellant ("Mother"), the mother of "Roger," appeals the decision of the

Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of

the child to Warren County Children Services ("the Agency").[1]  For the reasons outlined below, we affirm the juvenile court's decision.

### I.     Factual and Procedural Background

{¶ 2}   Mother and Roger's father ("Father") are the biological parents of Roger, a child born on December 14, 2020.  Neither Mother nor Father are citizens of the United States.  Mother is a legal resident of the United States, but testimony established that Father is "undocumented," meaning Father is in the United States illegally.  Mother and Father did not have valid driver's licenses during the relevant time period in this case.  Despite this, Father intended to teach Mother how to drive, though he had not done so during the instant proceedings.  At the time of Roger's birth, Mother and Father lived together at maternal grandmother's home in Mason, Ohio.

{¶ 3}   On December 18, 2020, the Agency filed a complaint alleging that Roger was a dependent child.  The complaint stated that Mother was diagnosed with borderline personality disorder, post-traumatic stress disorder ("PTSD"), obsessive compulsive disorder ("OCD"), chronic depression, and anxiety, but stopped taking medications for her mental health in 2016.  Mother exhibited cutting behaviors and was last hospitalized for a suicide attempt in 2018.  While at the hospital for Roger's birth, Mother claimed that she saw things coming out of the walls.

{¶ 4}   The complaint further alleged that Mother had difficulty caring for Roger while at the hospital.  According to the Agency, Mother insisted on breastfeeding Roger and was reluctant to let anyone help, despite experiencing complications in producing sufficient breastmilk.  As a result, the child was not receiving full feedings and did not produce any urine or feces for the first 24 hours after his birth.  Mother was resistant to using formula to

---

1. "Roger" is a pseudonym adopted in this opinion for purposes of privacy and readability.  *In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 1, fn. 1.

supplement her breastmilk, and due to the lack of nutrition, Roger had lost one-half pound since birth.

{¶ 5} The complaint also alleged that Mother was agitated with Roger at the hospital and would scream at him when he cried; was rough while changing his diaper; and made comments that she did not want him and he was annoying. The Agency stated that Mother lacked any problem-solving skills to resolve her increasing anxiety, frustration, and annoyance with Roger's needs.

{¶ 6} The complaint further claimed that Roger's father ("Father") lived with Mother but worked 12 hours per day. Mother did not want anyone around the baby when she returned home from the hospital, and refused any help taking care of Roger until he was old enough to speak. The complaint indicated Mother did not make much progress in caring for Roger between December 14, 2020 and December 18, 2020, despite help from the hospital.

{¶ 7} Following a hearing, the juvenile court granted emergency temporary custody to the Agency and Roger was placed in a foster home. The juvenile court appointed counsel for Mother and Father, as well as a court appointed special advocate ("CASA") to represent Roger, and counsel to represent CASA. Approximately two months later, in February 2021, Roger was placed with his current foster mother in a foster-to-adopt home.

{¶ 8} On February 17, 2021, the juvenile court held an adjudicatory hearing. The magistrate found that Mother suffered from significant mental illness and was in therapy at the time. Following the birth of Roger, Mother demonstrated concerning behavior toward the baby, including becoming very frustrated with him despite assistance. Mother reported she had no support or assistance at home, and the evidence presented at the hearing indicated Mother was incapable of providing the most basic care for Roger upon their release from the hospital. As such, the magistrate adjudicated Roger dependent and the

juvenile court adopted the magistrate's decision.  After a dispositional hearing on March 17, 2021, the Agency was awarded temporary custody of Roger, and he continued his placement in the foster home.

{¶ 9}   The Agency prepared a case plan with reunification as the goal.  The case plan indicated the Agency wanted Mother to obtain and maintain safe and stable housing; demonstrate mental health stability; obtain and maintain employment and provide a steady source of income; and to not associate with any known substance abusers.  To address the Agency's concerns, the case plan required Mother to submit to random drug screens; submit to a psychological evaluation and follow all recommendations; complete a mental health assessment and follow all recommendations; and to sign all necessary releases for the Agency.  The case plan identified similar Agency concerns for Father, but also detailed concerns relating to his demanding work schedule, including working 12-hour shifts on six to seven days per week, and his lack of engagement with Roger.  The case plan required Father to complete the same assessments as Mother and to submit to random drug screens.

{¶ 10} Mother and Father made progress on their case plans and as a result, the juvenile court extended temporary custody twice throughout the case.  The Agency also expanded the parents' visitation time with Roger, which advanced from four hours of supervised visitation at the Agency to two four-hour visits per week at maternal grandmother's home, where the couple was living at the time.  Four hours of their visitation time was unsupervised, while the remaining four hours were supervised by an employee from Agape for Youth ("Agape"), a program that works with families through either enhanced visitation or reunification services.

{¶ 11} On November 28, 2022, approximately one month following the final extension of Mother and Father's visitation time, CASA moved to terminate Mother and

Father's parental rights and for an order awarding permanent custody of Roger to the Agency. While the motion was pending, Mother and Father continued exercising their eight hours of visitation time with Roger. Thereafter, on March 6 and 14, 2023, the juvenile court held a two-day hearing on CASA's motion. During the hearing, the juvenile court heard testimony from 11 witnesses, including Mother, Father, Roger's foster mother ("Foster Mother"), a caseworker and caseworker supervisor from the Agency, Roger's CASA, the psychology assistant who conducted Mother's psychological assessment, two family support specialists from Agape, an employee from Help Me Grow, and Mother's former mental health therapist. In addition to testifying at the permanent custody hearing, Roger's CASA also submitted a report recommending that permanent custody be awarded to the Agency.

{¶ 12} On March 21, 2023, the juvenile court issued a decision granting permanent custody of Roger to the Agency. The court applied the R.C. 2151.414(B)(1) two-part permanent custody test. As for the first part of the two-part test, the juvenile court found that a grant of permanent custody to the Agency was in Roger's best interest. As for the second part of the two-part test, the juvenile court found that (1) Roger had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period and (2) that in the alternative, Roger could not be placed with either parent within a reasonable time period or should not be placed with his parents.

## II. Legal Analysis

{¶ 13} Mother now appeals the juvenile court's decision granting permanent custody of Roger to the Agency, raising the following assignment of error for our review:

{¶ 14} THE TRIAL COURT ERRED BY GRANTING PERMANENT CUSTODY TO WARREN COUNTY CHILDREN SERVICES.

{¶ 15} On appeal, Mother argues the juvenile court's decision granting permanent

custody of Roger to the Agency was against the manifest weight of the evidence and is supported by insufficient evidence. Specifically, Mother contends the juvenile court erred in concluding that terminating Mother's parental rights was in the best interest of the child.

## A.    Applicable Law and Standards of Review

{¶ 16} "Before a natural parent's constitutionally protected liberty interest in the care and custody of [her] child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 12th Dist. Brown No. CA2022-11-010, 2023-Ohio-1316, ¶ 44; R.C. 2151.414(E). Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 17. First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the "best interest" of the child. *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-047 thru CA2021-08-049, 2022-Ohio-48, ¶ 35. Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 31. Those circumstances include, but are not limited to: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned, R.C. 2151.414(B)(1)(c); (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); and (4) none of the previous three circumstances applies, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a). Only one of these circumstances need apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 12th

Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 16.

{¶ 17} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 12th Dist. Butler Nos. CA2019-05-071 thru CA2019-05-073, 2019-Ohio-4127, ¶ 19. However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-643, ¶ 18, citing *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 61. In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 15. Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 63.

**B.    First Part of the Permanent Custody Test: Best Interest Analysis**

{¶ 18} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors, including,

but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24.

{¶ 19} Based upon its consideration of the R.C. 2151.414 factors, the juvenile court found by clear and convincing evidence that it was in Roger's best interest to grant permanent custody to the Agency. In so doing, the juvenile court determined that Roger is not bonded with Mother, but is bonded to his foster family and is doing well. It further found that Roger's need for a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency, as Mother and Father are unable to meet Roger's needs, despite having ample time to remedy the conditions that caused his removal from their care. The court noted that Mother chooses to ignore her mental health issues and is incapable of parenting Roger or understanding what he needs. The court also detailed its concerns regarding Father, including his lack of knowledge regarding Mother's mental health issues, as well as his reliance upon Mother for housing due to his

- 8 -

"undocumented" status and lack of support outside of the home. The juvenile court described its concerns regarding Mother's living situation with maternal grandmother, as well as the tumultuous history of their relationship and its impact on Roger. As a result, the court concluded that the best chance for Roger was adoption and that awarding permanent custody to the Agency was in Roger's best interest.

{¶ 20} On appeal, Mother argues the juvenile court's best interest finding is unsupported by the record, as the testimony at the hearing established that Mother had made substantial progress on her case plan and she had demonstrated dramatic improvement in her life-coping and parenting skills. In light of this testimony, Mother claims each of the best interest factors weigh against an award of permanent custody to the Agency.

{¶ 21} Beginning with the interaction and interrelationships factor, R.C. 2151.414(D)(1)(a), Mother argues this factor weighs against an award of permanent custody to the Agency because an Agape family support specialist, Jessica Hedlund, testified that Roger's bond with his parents had improved by the time of the permanent custody hearing. However, simply because a child is bonded with his parents and has engaged in regular visitation with them does not render an award of permanent custody to a children's services agency against the child's best interest. *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-050 thru CA2021-08-052, 2022-Ohio-49, ¶ 33-40. Moreover, in focusing upon Hedlund's testimony that Mother's bond with Roger had improved in recent months, Mother disregards the significant evidence indicative of an only minimal bond between Mother and the child.

{¶ 22} For example, the psychology assistant who conducted Mother's psychological assessment also conducted a bonding assessment between Mother and Roger in September 2022. During the assessment, the psychology assistant noticed that Roger did

not appear to be securely attached to Mother and that he had difficulty separating from Foster Mother. Roger did not acknowledge Mother upon her arrival at the Agency, was initially indifferent to her presence, and did not make eye contact with her. The psychology assistant concluded there were problems in the interactions between Mother and Roger and that there were indications that the bond and attachment were not strong or nurturing. While the psychology assistant testified that reunification between Mother and Roger was not impossible, he recommended that it should be attempted slowly, as removing Roger from adults that he is bonded with could result in developmental delays or reactive attachment disorder.

{¶ 23} Testimony regarding Mother and Roger's bond was also provided by Candace Greenwood, an employee of Help Me Grow. Greenwood testified that she became involved with Mother during her pregnancy with Roger. Greenwood resumed weekly visits with the family in mid-2022, after Roger was born, and continued until the permanent custody hearing. The visits lasted between 60 and 90 minutes, and typically occurred when an Agape employee was not at the home. As a part of her visits, Greenwood provided parenting information to Mother as well as support for the reunification process. Greenwood observed that, while Mother generally showed emotion towards Roger, there were days that Mother was disengaged from him. Greenwood indicated she did not believe Mother intentionally failed to engage with the child, but that frustration in her relationships with Father and maternal grandmother influenced her behavior. Nonetheless, Greenwood explained that Mother sometimes could not read Roger's cues or understand that she needed to behave differently. A caseworker supervisor from the Agency similarly testified that Mother is unable to read Roger's cues or understand his developmental stage and reiterated the Agency's concerns with Mother's bond with Roger, as well as her general inability to nurture him.

{¶ 24} Additionally, Foster Mother testified that throughout Roger's placement with her, which began when Roger was two months old, she has observed his relationship with Mother and other providers. According to Foster Mother, Roger's relationships have blossomed with other caretakers like his teacher and therapists, but he displays more hesitation with Mother. Roger's CASA echoed Foster Mother's testimony at the hearing, and testified that with Mother, Roger is reserved, despondent, uncomfortable, and does not like interacting with her, but with others, he is friendly, affectionate, and wants to play. When Mother's unsupervised visitation with Roger was increased, Foster Mother and CASA noticed negative changes in Roger's behavior.

{¶ 25} There was also testimony that Roger's relationship with Foster Mother is different than his relationship with either Mother or Father. While with Foster Mother, Roger runs, claps, talks gibberish, and plays with his foster brothers. Roger's CASA described this behavior as noticeably different from his behavior during visits with Mother and Father, where he is rigid and reserved. According to Foster Mother, Roger has difficulty separating from her during visitation drop offs and is eager to return home with her afterwards. Roger has lived with Foster Mother since he was two-months old, and Foster Mother plans to adopt Roger if permanent custody is awarded to the Agency.

{¶ 26} When considering the above testimony, the juvenile court did not err in concluding that Roger's bond with Mother weighs in favor of an award of permanent custody to the Agency. Although we acknowledge Hedlund's testimony that Mother's bond with Roger had improved in recent months, the credibility of witnesses and the weight given to their testimony are primarily matters for the finder of fact. *In re R.K.*, 8th Dist. Cuyahoga No. 82374, 2003-Ohio-6333, ¶ 15. When considering the entirety of the evidence presented at the hearing, it is clear the juvenile court gave more weight to the testimony of the psychology assistant, the Help Me Grow worker, Roger's CASA, the caseworker supervisor,

and Foster Mother than the testimony from the Agape employee. As noted previously, where evidence is susceptible to more than one construction, we are required to give it the interpretation most favorable and consistent with the verdict and judgment. *In re D.S.*, 2022-Ohio-998 at ¶ 63. Accordingly, we conclude the juvenile court did not err in finding this factor weighs in favor of awarding permanent custody to the Agency.

{¶ 27} With regard to the wishes-of-the-child factor, R.C. 2151.414(D)(1)(b), we also reject Mother's claim that Roger's wishes weigh against awarding permanent custody to the Agency. In determining Roger's wishes, the juvenile court relied upon CASA's report recommending that permanent custody be awarded to the Agency. Mother does not dispute that the juvenile court was permitted to rely upon CASA's report when determining Roger's wishes, but instead argues that she and Father could provide a "secure, safe, and loving environment," which is the environment Roger presumably wished to live in.

{¶ 28} Contrary to Mother's claims, the record reflects that the environment she could provide for Roger at the time of the hearing was neither "secure" nor "safe." The testimony at the hearing established that Mother and Father rely upon maternal grandmother for housing. Mother and maternal grandmother have had an inconsistent relationship since Mother was young, and Mother testified that maternal grandmother is responsible for some of Mother's mental health diagnoses and most of her past traumas. Although Mother testified that she and maternal grandmother get along, she also stated they argue a lot, that maternal grandmother oftentimes wants Mother out of the home, and that Mother believes maternal grandmother may have untreated mental health illnesses. Throughout the case, multiple providers worked with Mother and Father to find alternative housing but were ultimately unsuccessful in doing so.

{¶ 29} The record also reflects Mother and maternal grandmother were involved in physical altercations throughout 2022. On one occasion, Mother contacted law

enforcement after maternal grandmother kicked in Mother's bedroom door and attacked Mother with a broom. In addition to Mother, other witnesses testified that Mother did not have a good relationship or history with maternal grandmother. Notably, the Agency recommended family therapy to address some of these concerns, but maternal grandmother refused to participate.

{¶ 30} Notwithstanding the concerning nature of their relationship, maternal grandmother remains Mother's primary support system and Mother planned to utilize maternal grandmother's assistance in caring for Roger if he was returned to Mother's care. This is particularly concerning given Mother's acknowledgment to an Agape employee that Roger should not be around maternal grandmother unsupervised. Moreover, despite applying for approximately 30 apartments, neither Mother nor Father had obtained independent housing prior to the hearing. In fact, Mother testified at the hearing that she had no definitive plan for alternative housing. Although Mother and Father testified that obtaining citizenship and driver licenses would alleviate their issues with obtaining housing and transportation, neither party had initiated the citizenship process. Instead, Mother and Father planned to reside with maternal grandmother and to rely upon her for childcare and transportation when necessary. Given the tumultuous relationship between Mother and maternal grandmother, and Mother's dependence on maternal grandmother to care for Roger, it is evident that Mother cannot provide a safe and stable environment for Roger at this time.

{¶ 31} Regarding the remaining best interest factors, Mother claims they also weigh in her favor because she made substantial progress on the case plan and was nearing a point where Roger could have been returned to her care. As an initial note, it is well settled that "the key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's

removal from the parent's custody." *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification, as the case plan is simply a means to a goal, but not the goal itself." *In re A.R.*, 12th Dist. Butler No. CA2015-08-143, 2016-Ohio-4919, ¶ 18. Nevertheless, the record reflects Mother neither satisfied her case plan objectives nor substantially remedied the concerns that caused Roger's removal from her care.

{¶ 32} Regarding Mother's mental health, the caseworker supervisor and Agency caseworker testified that Mother's mental health was a concern at the time of Roger's removal from her care and remained a concern at the time of the permanent custody hearing. At the hearing, evidence was presented that Mother has an extensive history of mental health concerns. According to the psychology assistant who conducted Mother's psychological assessment, Mother has significant past trauma, including a history of sexual assault by relatives when she was a child, as well as sexual assault perpetrated by men maternal grandmother allowed to live in her home. Mother began mental health treatment at 16 years old and had been hospitalized for mental health issues more than 15 times. Mother has a history of self-harm and suicide attempts, which have persisted throughout the case. Notably, Foster Mother testified she observed cut marks on Mother's arms at various periods and there were reports that Mother had suicidal ideations as recently as the fall and winter of 2022.

{¶ 33} After an assessment in 2021, Mother was diagnosed with borderline personality disorder ("BPD"), which is "a set of maladapt personality traits that create difficulties in an individual's interpersonal relationships." Common symptoms of BPD include frequent threats of harm, turbulent interpersonal relationships, impulsivity, and rapid mood changes. Mother was also diagnosed with unspecified anxiety disorder by history, cannabis use disorder moderate in early remission, unspecified depressive disorder by

- 14 -

history, intellectual disability mild, PTSD by history, and a "rule out" diagnosis for excessive compulsive personality disorder and OCD.

{¶ 34} Testimony established that the most effective way to treat BPD is through a process called dialectical behavioral therapy ("DBT"), which is an intensive combination of individual and group therapies that typically lasts two years. The psychology assistant recommended Mother engage in DBT, and indicated that, due to Mother's intellectual disabilities, the DBT process would take more time. Given her diagnoses, it was the psychology assistant's clinical opinion that Mother should engage in individual therapy, as well as group therapy, using the DBT methods. Despite these recommendations, Mother discontinued DBT after three months, and had disengaged from therapy entirely by the time of the permanent custody hearing.

{¶ 35} In early 2022, Mother's former therapist became concerned when Mother asked for a diagnosis assessment update, which occurs when a client feels he or she has been misdiagnosed. At that time, the therapist concluded Mother was not reporting symptoms of BPD. A few months later Mother reported that she agreed with the BPD diagnosis, but her boyfriend, Father, had instructed her to say that she did not have the disorder in order to "get the baby back faster." At the hearing, Mother initially denied that Father instructed her to dispute her diagnosis, but later acknowledged he had instructed her to do so and further admitted to lying to her various providers, including her former therapist.

{¶ 36} The therapist described Mother's treatment as "very on and off," as there would be stretches of time where therapy was "going really great," but also times where it was "really hard." Mother tended to downplay her therapist's concerns and would respond that everything was going smoothly or was fine, a pattern noticed by the caseworkers as well. Towards the end of his sessions with Mother, the therapist felt Mother was giving push

back on the things he was attempting to address with her and that, due to her lack of response to him, he could not progress any farther with Mother on an individual basis.

{¶ 37} The therapist specifically noted Mother's "job hopping" and lack of support in her personal life outside of her home as two topics where Mother attempted to justify her behavior and provide excuses. As a result, he suggested that group therapy would be the best treatment for her at that time. A few months after this recommendation, Mother requested to discontinue therapy entirely, which her therapist did not support. Nonetheless, Mother had ceased all therapy by the time of the hearing, and believed she could fix her mental health problems with "sheer determination." And though Mother was prescribed several medications for her mental health, Mother had stopped taking those medications by the time of the hearing. Mother explained that she stopped taking these medications because she feared potential weight gain and because a friend had recommended that she do so.

{¶ 38} Despite Mother's efforts, the record reflects many of her therapist's concerns existed at the time of the permanent custody hearing, including a lack of support outside of the home and trouble with her interpersonal relationships, as well as an inability to maintain employment or stability for any extended period. Notably, the caseworker supervisor testified that Mother had been employed at seven jobs since the beginning of the case, and that Mother's instability in her employment was linked to her instability in her mental health. Mother's decision to address her mental health issues on her own, without the assistance of trained professionals or medication, emphasizes her inability to understand the severity of her diagnoses or their impact on her behavior and on her ability to parent. It is also consistent with her therapist's testimony that although there were times where Mother was very open about her mental health, there were others where she was simply in denial.

{¶ 39} Although Mother testified she was making strides in her mental health, Foster

Mother recently observed cutting marks on Mother's arms and Mother attempted to commit suicide in February 2022 and expressed suicidal ideations in late 2022. On a separate occasion, Mother was placed on a 72-hour hold at the Lindner Center due to statements to her caseworker that she would kill herself if the caseworker did not "give the baby back." The Lindner Center recommended Mother to complete in-patient services, but she did not do so. Accordingly, when considering Mother's efforts and progress in addressing her various mental health diagnoses, we conclude Mother did not substantially remedy the Agency's concerns regarding her mental health.

{¶ 40} Mother also failed to remedy the Agency's concerns regarding her ability to properly care for Roger. At the time of the permanent custody hearing, the Agency remained concerned that Mother was unable to understand and process Roger's needs at various developmental stages. The caseworker supervisor testified that despite Mother being offered every service possible, Mother simply cannot grasp what Roger needs or how to meet those needs. The supervisor identified several examples of Mother's inability to understand Roger's needs throughout the case, including failing to process the different reasons Roger could be crying; giving Roger inappropriate foods for his age (for example, she gave Roger steak before he had teeth); struggling to nurture Roger or adequately respond when he was upset; and giving Roger—a toddler—deflated latex balloons to play with while riding in the car.

{¶ 41} Greenwood from Help Me Grow expressed similar concerns with Mother's ability to parent Roger. At the hearing, Greenwood testified that Mother has a lot of trauma and scars from her past that continue to affect her, rendering this case one of the most concerning cases with which Greenwood was involved. Greenwood explained that, although Mother was working on herself and doing better, she was very "up and down" as far as her mood was concerned. During her testimony, Greenwood noted several concerns

she had after observing Mother with Roger, including Mother's visible displays of frustration, her lack of patience with the child, and her inability to respond appropriately when the child was upset. Notably, many of these concerns were present at the time of Roger's removal from Mother's care in 2020.

{¶ 42} The psychology assistant likewise testified that the results of Mother's assessment indicated she was high risk in her attitude toward parent, child, and family roles. According to the psychology assistant, this meant Mother was high risk in her ability to understand the role of the child and parent during interactions, and her ability to place the child's needs above her own. Due to the results of the assessment, the psychology assistant recommended intensive parenting classes, which Mother completed. Notwithstanding Mother's completion of the parenting classes, providers observed no change in Mother for long periods of time. Mother continued to exhibit inappropriate behavior for a parent, including upsetting Roger by purchasing him a new toy but then taking it away, saying "mine." As a result of Mother's behavior, Roger became visibly upset and required consoling by Foster Mother. Mother also downplays Roger's various medical conditions and needs, despite advice and explanation from medical professionals.

{¶ 43} In order to demonstrate that she is capable of parenting Roger, Mother relies on the testimony and written reports from Hedlund, the Agape employee, who testified that she began supervising four hours of the parent's visitation time with Roger in August 2022. Between August 2022 and December 2022, Hedlund did not observe any improvement in Mother's parenting abilities; however, in late December 2022 or early January 2023, Hedlund believed that Mother demonstrated a desire to care for Roger and seemed to be

more engaged with him.[2]

{¶ 44} Initially, Agape engaged in enhanced visitation services with the family, during which a representative, like Hedlund, supervised visits and prepared a report for the Agency. In general, Agape's enhanced visitation services continued for a designated period, after which the family would transition to the reunification program if the appropriate agency recommended more time with the child. In this case, the family transitioned to the reunification program in January 2023, however, Hedlund explained this was due to a billing issue, not because the parents had made sufficient progress to cease the enhanced visitation supervision. Notwithstanding the reasoning behind their advancement to the reunification program, Hedlund testified that Mother and Father had made "some progress" by the time of the permanent custody hearing; that she was not critical of Mother or Father; and that she did not have many concerns with their parenting.

{¶ 45} While Mother claims Hedlund's testimony establishes she has remedied any concerns relating to her ability to care for Roger, we disagree. Despite Hedlund's testimony that Mother had improved in recent months, she also explained that she is not trained to say whether reunification between Mother and Roger was appropriate. Instead, it is the Agency's role, not Agape's, to make that recommendation. To that point, CASA presented evidence that the Agency was less concerned with Mother's ability to parent on a short-term basis, such as the visitation supervised by Hedlund, than her ability to care for Roger long-term. Specifically, an Agency caseworker testified that Mother had developed a routine that she repeated at each visit; however, the Agency remained concerned with Mother's ability

---

2. As noted by Mother in her brief, the juvenile court misstated a portion of Hedlund's testimony when it found that Mother had recently regressed in her engagement during visitation with Roger. Instead, Hedlund testified that she saw a different Mother at that time than she did in August 2022. Notwithstanding the juvenile court's misstatement, the court was permitted to assess Hedlund's testimony as a whole, during which she mentioned improvements by Mother, as well as some concerning behavior. Moreover, based upon other testimony regarding Mother's behavior during visitation, we find the juvenile court reasonably concluded that Mother has ongoing problems.

to adjust that routine as Roger grows and develops. According to the Agency, Mother struggles with any disruption to her routine, and does not understand how to redirect Roger or get back on track. This is consistent with additional testimony presented at the hearing that Mother would get frustrated when Roger cried; experienced trouble calming him down; and needed to call Foster Mother to ask questions about Roger's behavior, daily care, and routine.

{¶ 46} In light of the above testimony, and while Mother may have made some progress in her parenting abilities, it is clear she has not remedied the Agency's concerns regarding her ability to parent or care for Roger on a long-term basis. While there is a possibility that Mother could learn to adapt, "[a] child's life is not an experiment that can be left to chance." *In re K.G.*, 12th Dist. Clermont Nos. CA2020-08-047 thru CA2020-08-049, 2021-Ohio-1182, ¶ 57. "'The law does not require the court to experiment with a child's welfare to see if the child will suffer great detriment or harm.'" *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 30, quoting *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶ 53. "A child should not have to endure the inevitable to its great detriment and harm in order to give the * * * parent an opportunity to prove [her] suitability." *In re P.S.*, 5th Dist. Licking No. 16-CA-11, 2016-Ohio-3489, ¶ 51.

{¶ 47} In this case, the Agency has been involved with Roger since his birth in 2020. Thus, at the time of the permanent custody motion, Mother had been given approximately two years to remedy the Agency's concerns. The fact that Mother *may* have somewhat improved in her parenting abilities shortly before the permanent custody hearing is simply too little, too late. "A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60, quoting *In re Keaton*, 4th Dist. Ross Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, ¶ 61. For most

of this case, Mother made no changes to her behavior, and failed to demonstrate she could provide a safe and stable environment for the child. It is not in Roger's best interest to gamble on the possibility that Mother may continue progressing and obtain stability in the future. This is especially true where the child is now thriving in a stable and secure environment with Foster Mother, and Mother continues to downplay the severity and impact of her mental health diagnoses.

{¶ 48} Based on our review of the record, we conclude that the juvenile court did not err in determining that an award of permanent custody to the Agency was in the child's best interest. There is more than sufficient credible evidence to support the juvenile court's determination that the statutory standards for permanent custody have been met. As noted above, the child's best interest is served by being placed in a permanent situation that fosters growth, stability, and security. The record establishes that Mother could not provide these things at the time of trial.

{¶ 49} We frequently see permanent custody appeals involving behavior that is, on its face, far more shocking than some of Mother's behavior that led the juvenile court to award permanent custody to the Agency in this case. We pause here to emphasize that there are many parents in this state who live in poverty, who have a checkered employment history, who have intellectual disabilities, who do not get along with relatives, who have difficulty finding housing, who are in the United States illegally, who have mental health problems, who disagree with a doctor's diagnosis or find prescribed medicine unhelpful, who can at times be irritated by their children, or who fight with their spouses. These things, either individually or collectively, do not necessarily mean that it is in the best interest of the children of such parents to be placed in the permanent custody of an agency. In other words, a parent who lives in poverty, who is diagnosed with mental health problems, who has intellectual disabilities, or who falls into one of the other categories mentioned above

may be a bad parent, an average parent, or even an ideal parent. So our opinion today should not be overinterpreted as holding that it was in Roger's best interest to be placed in the Agency's custody merely because Mother faced the challenges described above. Instead, our holding today affirms that the juvenile court's decision was not based on insufficient evidence and was not against the manifest weight of the evidence *given the specific facts of this case*, and in particular the specific ways in which Mother has proven incapable of providing a permanent situation for Roger that fosters growth, stability, and security.

### C.      Second Part of the Permanent Custody Test

{¶ 50} Turning to the second part of the permanent custody test, the juvenile court found by clear and convincing evidence that Roger had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period at the time the Agency filed its motion for permanent custody. R.C. 2151.414(B)(1)(d). The juvenile court also found that "[i]n the event either parent alleges [Roger] has not been in the temporary custody of" the Agency for 12 or more months of a 22 month period, then "the Court finds pursuant to R.C. 2151414(B)(1)[(a)] * * * [that Roger] cannot be placed with Mother or Father within a reasonable period of time or should not be placed with them."

{¶ 51} Mother does not dispute that Roger has been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period but claims the court's "reasonable period of time" finding is unsupported by the record. As noted above, only one of the R.C. 2151.414(B)(1) findings must be met to satisfy the second prong of the two-part permanent custody test. *In re J.N.L.H.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 26. As such, because Mother does not challenge the juvenile court's "12 of 22" finding, we need not review the issue further. *In re J.G.*, 12th Dist. Clermont No. CA2023-

04-029, 2023-Ohio-2712, ¶ 16; *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-643, ¶ 43. However, we note that the record unquestionably establishes that the "12 of 22" finding was met in this case because the child was removed from Mother's care in December 2020, was adjudicated dependent in February 2021, and the Agency did not move for permanent custody of the child until November 2022, nearly two years after the child was placed in the Agency's temporary custody. Therefore, there is no question that the second part of the permanent custody test was satisfied in this case.

### III.    Conclusion

{¶ 52} In light of the foregoing, we conclude the juvenile court did not err by determining that it was in Roger's best interest to grant permanent custody to the Agency. As such, we find the juvenile court's decision to grant permanent custody of Roger to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's sole assignment of error is overruled.

{¶ 53} Judgment affirmed.

S. POWELL, P.J. and PIPER, JJ., concur.