[Cite as *In re J.F.*, 2023-Ohio-4244.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| J.F. | : | CASE NO. CA2023-06-065 |
| | : | O P I N I O N<br>11/27/2023 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2020-0186

Michael T. Gmoser, Butler County Prosecuting Attorney, and John C. Heinkel, Assistant Prosecuting Attorney, for appellee.

Garrett Law Offices, and Dawn S. Garrett, for appellant.

Father, pro se.

Tracy A. Jackson, guardian ad litem.

**BYRNE, J.**

{¶ 1} Appellant ("Mother"), the mother of J.F. ("James"), appeals the decision of the

Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of the child to Butler County Department of Job and Family Services ("the Agency").[1] For the reasons outlined below, we affirm the juvenile court's decision.

## I. Factual and Procedural Background

{¶ 2} James was born to Mother on July 15, 2020. Just two days later, on July 17, 2020, the Agency filed a complaint alleging that James was a dependent child. The juvenile court granted the agency emergency temporary custody the same day. The complaint stated that Mother was severely mentally ill and unable to care for her son; Mother had been diagnosed with schizoaffective disorder bipolar type but had stopped taking her prescribed medications and had ceased utilizing mental health services. The complaint further alleged that Mother has had documented mental health issues for at least ten years and had been probated into mental health facilities in 2015 and 2018. On April 5, 2020, Mother was probated to the Beckett Springs behavioral health hospital where she remained until May 22, 2020. Otherwise, Mother resided with her parents, but the Agency expressed concern that her parents did not understand the gravity of Mother's mental health issues. On July 20, 2020, following a hearing, the juvenile court ordered James be placed in shelter care with the agency. On August 19, 2020, James was adjudicated to be a dependent child based upon stipulations to portions of the complaint.

{¶ 3} On September 11, 2020, the juvenile court held a dispositional hearing and adopted a case plan with reunification as the goal. The case plan required Mother to be engaged in mental health services, to take all prescription medications as recommended, to become stabilized, and to acknowledge her mental health diagnoses. The case plan also referred Mother for a full psychological assessment to determine the services in which she

---

1. "James" is a pseudonym adopted in this opinion for purposes of privacy and readability. *In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 1, fn. 1.

should be engaged. Finally, the case plan required Mother to participate in a Developmental Living Skills (DLS) program in order to improve her parenting skills, and at a time closer to reunification, the plan required Mother to engage in a more intense program such as the Family Preservation Program, which would take place in Mother's home.

{¶ 4} At the same time, the juvenile court ordered genetic paternity testing, which successfully determined the identity of James' father ("Father"). Father did not seek custody of James, but stated that he loved his son, and wanted him to be adopted by the assigned foster family.

{¶ 5} On August 16, 2020 and September 15, 2020, Mother underwent psychological evaluation, with both of her parents present, at CDC Behavioral Health Services in Hamilton, Ohio. Mother presented as highly delusional and psychotic at both of her appointments, and the assessor observed that Mother appeared to have difficulty differentiating reality from fantasy or delusion. Mother claimed to possess psychic abilities and claimed that she knew several years ago she would be meeting with the assessor. Despite these concerning behaviors, Mother's parents claimed she was not currently delusional, minimized her symptom presentation, and stated that they did not understand why the healthcare providers were concerned about Mother's ability to function independently.

{¶ 6} Mother began the DLS program on September 1, 2020. However, Mother missed multiple appointments and terminated the DLS program on October 7, 2020 because she felt she did not need the service. Mother eventually reengaged with DLS in March 2021 and completed the program on August 18, 2021. The DLS Exit Report noted that Mother showed little interest in gaining independence from her parents, permitting them to manage her funds and stating on many occasions that when they die, her brother would be responsible for taking care of her in the same way.

{¶ 7} Mother regularly attended supervised visits with James until January 10, 2023, when she ceased entirely. Up until that point, Mother appeared to generally have a loving bond with James, but certain interactions and incidents drew serious concern from the care providers. Mother was resistant to James transitioning to solid foods and expressed some apprehension over James being potty trained. She even opined that James being potty trained may lead to his death. On another occasion, Mother tried to prevent James from participating in outdoor celebrations on the Fourth of July—opining that the noises would cause him to become dehydrated. Mother continually refused to follow the advice of the visitation center's supervising staff and would not discipline James. Mother would not be firm with James and would not use "cool-downs" or "time-outs." Mother also tried to prevent James from traveling outside the foster home and expressed that she did not want James riding in cars unless absolutely necessary. On another occasion, Mother advised that she does not leave home at all and would not do so with James. Mother discussed with a visitation supervisor that she had lived past lives going back thousands of years, was psychic, and could predict certain future events. Overall, Mother had a tenuous grip on the purpose and importance of these supervised visits and therefore made limited progress developing her parenting skills.

{¶ 8} The Agency made numerous attempts to conduct a home study of Mother's parents' residence to determine if it was safe and appropriate for James to live there, but each time Mother's parents refused to set an appointment, or if an appointment was made, they would cancel it, often citing concerns over COVID. During the entire pendency of this case, only one professional—mother's therapist—was ever permitted access into the home. Although the therapist's report was favorable, she was only present in and only observed in one room of the house. Father later vigorously testified against placement of James in Mother's care, her parents' care, or any combination thereof. Father testified that he had

been in Mother's parents' house approximately five times in 2019, and described it as cluttered, dirty, and smelling of animal feces. Father expressed fear that if James was placed there, Mother's family would cut him off from the outside world. This testimony was reinforced by Mother's previous comments that she did not want James to ever leave the house.

{¶ 9} For the first 14 months after James was removed from Mother's care, Mother made little progress in terms of mental health treatment. Then in September 2021, Mother sought out and began treatment at Ray of Hope counseling services in Mason, Ohio. Mother's therapist, Maury McCoy, testified that Mother appeared at that time to have schizoaffective disorder, having a flat, catatonic, affectation, and making random movements of her hands, head, and arms. Nevertheless, therapist McCoy and Mother's psychiatrist, Dr. Gilmore-Gordon, concluded that Mother did not suffer from schizoaffective disorder, but rather suffered from depression and post-traumatic stress disorder. However, Mother never provided her mental health history to therapist McCoy, who instead relied entirely on what Mother self-reported during therapy sessions, many of which occurred over the telephone. Dr. Gilmore-Gordon did not review Mother's mental health history until sometime after she had begun treating Mother.

{¶ 10} Review hearings were held on January 7, 2021; April 2, 2021; October 5, 2021; December 28, 2021; March 22, 2022; and May 26, 2022. On March 16, 2022, the Agency filed a motion for permanent custody of James, and on November 15, 2022, the Guardian ad Litem for James filed a report recommending permanent custody be granted to the agency.

{¶ 11} The Agency's motion for permanent custody was heard on November 15, 2022; January 31, 2023; February 8, 2023; February 23, 2023; and concluded on March 2, 2023. At the hearings it was apparent that Mother still suffered from disorganized thinking

and panic attacks, and harbored several delusions. Mother continued to insist that she is psychic and that she has lived past lives and reincarnated. Mother admitted that during a visit with James, she provided a handwritten note to a care provider that stated "Gretchen, I remember being terrified of [Father], hailstorm, Lizzy Hail, Oxford Ridge, White dress and knife." In her testimony, Mother suggested that in a previous life she was a cancer patient or possibly even lived as musician Lizzy Hale, and these experiences were mirrored in lyrics from the rock band Hailstorm. Mother further claimed that she had been in a relationship with Father in a previous life where he had severely beaten her and was sent to prison for eight years. Later, Mother failed to appear at the February 8, 2023 hearing, with her counsel asserting that she was absent due to stress induced illness. She again failed to appear at the proceedings on March 2, 2023, without any explanation.

{¶ 12} Dr. Gilmore-Gordon and therapist McCoy testified on Mother's behalf, reiterating that she did not suffer from schizoaffective disorder, and concluding that she should be able to function as a caregiver to James. However, in light of Mother's lack of transparency with these care providers, Mother's previous delusional testimony, and the overwhelming reports of Mother's ongoing mental health problems, the juvenile court did not find the testimony of Dr. Gilmore-Gordon and therapist McCoy persuasive.

{¶ 13} On April 3, 2023, the magistrate issued a decision granting permanent custody of James to the Agency. In the decision, the magistrate applied the R.C. 2151.414(B)(1) two-part permanent custody test. As for the first part of the two-part test, the magistrate found that a grant of permanent custody to the Agency was in James' best interest. As for the second part of the two-part test, the juvenile court found that James had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. On the same day, the juvenile court judge approved and adopted the magistrate's decision as the decision and final judgment of the court.

{¶ 14} Mother objected to the magistrate's decision on April 13, 2023, and a hearing was held on June 13, 2023. Mother was again absent without any explanation. The juvenile court overruled Mother's objections on June 14, 2023, and Mother filed a notice of appeal on June 16, 2023.

## II. Legal Analysis

{¶ 15} Mother now appeals the juvenile court's decision granting permanent custody of James to the Agency, raising the following assignment of error for our review:

{¶ 16} THE TRIAL COURT ERRED BY GRANTING PERMANENT CUSTODY TO WARREN COUNTY CHILDREN SERVICES.

{¶ 17} On appeal, Mother argues the juvenile court's decision granting permanent custody of James to the Agency was against the manifest weight of the evidence and is supported by insufficient evidence. Within her sole assignment of error, Mother raises two arguments. First, Mother claims that granting permanent custody to the Agency is not necessary and therefore not in the best interest of James because she has addressed the conditions that led to James' removal. Specifically, Mother claims she has addressed her mental health issues, she has a safe and appropriate home for James to live in, she and James are bonded, and she has demonstrated an ability to nurture and parent James appropriately. Second, Mother argues that the agency failed to provide testimony demonstrating reasonable efforts to locate relatives for placement, and therefore the juvenile court could not award permanent custody to the Agency. However, Mother does not elaborate on this claim or cite to any law whatsoever.

## A. Applicable Law and Standards of Review

{¶ 18} "Before a natural parent's constitutionally protected liberty interest in the care and custody of [her] child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met."

*In re M.G.*, 12th Dist. Brown No. CA2022-11-010, 2023-Ohio-1316, ¶ 44; R.C. 2151.414(E). Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 17. First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the "best interest" of the child. *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-047 thru CA2021-08-049, 2022-Ohio-48, ¶ 35. Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 31. Those circumstances include, but are not limited to: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned, R.C. 2151.414(B)(1)(c); (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); and (4) none of the previous three circumstances applies, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a). Only one of these circumstances need apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 16.

{¶ 19} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 12th Dist. Butler Nos. CA2019-05-071 thru CA2019-05-073, 2019-Ohio-4127, ¶ 19. However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-

643, ¶ 18, citing *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 61. In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 15. Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 63.

**B. First Part of the Permanent Custody Test: Best Interest Analysis**

{¶ 20} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month

- 9 -

period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 21} A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24.

{¶ 22} Mother essentially argues that the juvenile court should have given greater weight to her testimony, as well as to the testimony of Dr. Gilmore-Gordon and therapist McCoy, that she had remediated her mental health issues, had a good relationship with James, and had a safe home for him to live in. However, the juvenile court simply did not find these claims to be credible.

{¶ 23} Based upon its consideration of the R.C. 2151.414 factors, the magistrate found by clear and convincing evidence—and the juvenile court affirmed—that it was in James' best interest to grant permanent custody to the Agency. Regarding the first and second best interest factors, the juvenile court recognized that James has been in foster care virtually his entire life and therefore is not bonded to Mother. In fact, Mother stopped visiting with James in January 2023. James' Guardian ad Litem supported the Agency's motion for permanent custody and all reports indicated that James was loved and well cared for by his foster family, which is interested in adopting him if that becomes a possibility. Father has been supportive of the motion for permanent custody by the Agency and has been adamantly opposed to placement of James with Mother or Mother's parents.

{¶ 24} Regarding James' need for a legally secure permanent placement, the court recognized that Mother had an extensive history of mental health problems and had been

- 10 -

probated into mental health facilities several times. Although Mother may have made some progress under the care of Dr. Gilmore-Gordon and therapist McCoy, this progress was too little, too late. Whatever progress Mother made was diminished by Mother's obfuscation of her mental health history, and was outweighed by Mother's own testimony at trial that evidenced her ongoing delusions. Throughout the pendency of this case, Mother failed to coordinate a single home study with the Agency to assess living conditions, and only had one positive visit from her therapist, who had a limited view of the home from a single room.

{¶ 25} The credibility of witnesses and the weight given to their testimony are primarily matters for the finder of fact. *In re R.B.*, 12th Dist. Warren No. CA2023-03-032, 2023-Ohio-3145, ¶ 26. Where evidence is susceptible to more than one construction, we are required to give it the interpretation most favorable and consistent with the verdict and judgment. *Id.* Although Mother presented some favorable testimony at trial, we find that the juvenile court did not err in concluding that it was outweighed by other evidence of Mother's severe and ongoing mental health problems and her inability to provide appropriate care to James. Accordingly, the juvenile court did not err in finding the best interest factors weighed in favor of awarding permanent custody to the agency.

## C. Second Part of the Permanent Custody Test

{¶ 26} Mother on appeal does not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d) that James had been in the temporary custody of CCDJFS for at least 12 months of a consecutive 22-month period. Because Mother does not challenge this "12 of 22" finding, we need not review the issue further. *In re J.N.L.H.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 26. However, we note that the record unquestionably establishes that the "12 of 22" finding was met in this case because James was adjudicated dependent in August 2020, and James remained in the Agency's custody through the date the agency filed for permanent custody, in March 2022.

**D. Efforts to Locate Relatives**

{¶ 27} Within her sole assignment of error, Mother raises a cursory argument that the Agency failed to present testimony that demonstrated its reasonable efforts to locate relatives with whom James could be placed. However, Mother fails to make any argument in support of this claim, citing no law and making no reference to the record. App.R.16(A)(7) provides that an appellant's brief must include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." This court may disregard an assignment of error if a party fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief. *Bobie v. Bobie*, 12th Dist. Butler No. CA2022-12-119, 2023-Ohio-3293, ¶ 64. Therefore, we decline to consider Mother's argument.[2]

**III. Conclusion**

{¶ 28} In light of the foregoing, we conclude the juvenile court did not err by determining that it was in James's best interest to grant permanent custody to the Agency. As such, we find the juvenile court's decision to grant permanent custody of James to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's sole assignment of error is overruled.

{¶ 29} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.

---

2. We note that the permanent custody statute does not require a juvenile court to consider relative placement before granting a motion for permanent custody. *See In re E.S.*, 2d Dist. Clark No. 2016-CA-36, 201-Ohio-219, ¶ 59. Even so, at the October 5, 2021 review hearing, an agency caseworker indicated that the Agency had sent out letters and conducted multiple relative searches using Accurint, a locate-and-research tool used in investigations. Further, no relatives or non-relatives, including Mother's parents, came forward seeking placement of James.