[Cite as *In re X.S.R.S.*, 2024-Ohio-1636.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


|                        |   |                              |
|------------------------|---|------------------------------|
| IN RE:                 | : |                              |
| X.S.R.S., et al.       | : | CASE NO. CA2023-12-128       |
|                        | : | O P I N I O N<br>4/29/2024   |
|                        | : |                              |
|                        | : |                              |
|                        | : |                              |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2021-0117, JN2021-0118, JN2021-0226


Garrett Law Offices, and Dawn S. Garrett, for appellant.

Andrew J. Brenner, for appellee, Father.

Michael T. Gmoser, Butler County Prosecuting Attorney, and John C. Heinkel, Assistant Prosecuting Attorney, for appellee, Butler County Children Services.

Amy R. Ashcraft, for CASA.

Legal Aid Society of Southwest Ohio, LLC, and Jamie Landvatter, for Guardian ad litem.


**PIPER, J.**

{¶ 1} Appellant ("Mother"), the mother of X.S.R.S. ("Jane"), K.S.S.G. ("Karen"),

and J.R.S. ("John"),[1] appeals the decisions of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to the Butler County Department of Job and Family Services ("the Agency"). For the reasons that follow, we affirm the juvenile court's decision.

## I. Facts and Procedural History

**{¶ 2}** This case involves three minor children—Karen, born December 10, 2009; Jane, born December 12, 2012; and John, born August 14, 2021. "Father" is the biological father of Jane and John, and he participated in the juvenile court proceedings.[2] Karen's biological father did not participate, and his identity is unknown.

**{¶ 3}** In January 2021, the Agency received a report that the girls had been sexually abused by Father. The Agency immediately filed a complaint alleging that Jane and Karen were dependent and abused children and asking for emergency temporary custody of them, which the juvenile court granted.[3] The girls were removed from the home and placed in a foster home. On May 10, 2021, the girls were adjudicated dependent, by stipulation after the allegations of abuse were withdrawn. The following August, two days after he was born, the Agency filed a dependent-child complaint for John and requested temporary custody of him, which the court granted. John was placed in the same foster home as his sisters. In October 2021, John was adjudicated dependent. Two guardians ad litem ("GAL" and "Co-GAL") were appointed for the children, as well as a court appointed special advocate ("CASA").

---

1. "Jane," "Karen," and "John" are pseudonyms adopted in this opinion for purposes of privacy and readability. *See In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 1, fn. 1.

2. Father did not appeal and is not a party in this appeal.

3. The Agency refiled the complaints a few months later in the present cases. The magistrate took judicial notice of everything in the original cases.

{¶ 4}  A case plan was developed for the family with the goal of reunification.  But in the months that followed, it became apparent to the Agency that the parents were unlikely to ever provide adequate care for the children.  Finally, on April 20, 2022, the Agency moved for permanent custody of the two girls, alleging that they had been in its temporary custody for 12 or more months of a consecutive 22-month period and that neither child could, nor should, be placed with either parent within a reasonable time.  Six months later, on October 22, the Agency moved for permanent custody of John, based on the same allegations.

{¶ 5}  A permanent-custody hearing for the children was held before the magistrate over five days in February, March, April, and May 2023.  Mother and Father testified as well as the children's foster mother, therapists who worked with the family and the girls, the family's caseworker, and others.  Documents were also admitted into evidence, including a report and recommendation from the GALs and a report and recommendation from the CASA.  The magistrate also conducted in camera interviews with each girl.

{¶ 6}  The testimony showed that after their removal, the girls continued to reveal concerning information about their lives with Mother and Father.  Both girls consistently talked about domestic violence, physical abuse by both parents, and sexual abuse and sex trafficking of the girls by Father.  A no-contact order was entered for Father, and the girls had supervised visits with Mother.  In the summer of 2021, it was discovered that at the conclusion of these visits, when she was hugging the girls, Mother would sometimes whisper comments to them about the case.  This was how the girls learned that Mother was expecting a baby with Father.  This news greatly upset the girls—that Mother had continued to have a relationship with Father despite knowing that they had accused him of sexually abusing them.  It was then that the girls said they no longer wanted to visit

with Mother. Even more upsetting to the girls was later learning that Mother had named the baby after Father.

{¶ 7} Witnesses testified that Mother had engaged in the case-plan services but that there appeared to be no change in her insight and ability to parent the children appropriately. Mother did not acknowledge the existence of the problems in the home that prompted the children's removal. She initially said she did not believe the girls' allegations of sexual abuse, then said that she did believe them but wanted proof. Father had admitted no wrongdoing at all. Mother has continued to engage in behavior detrimental to her children's well-being. It was discovered that Mother was surreptitiously communicating with the girls at family therapy sessions. Mother was cautioned many times to stop, because it was having a negative effect on the girls. But she continued to do so when she thought that she would not be caught. Ultimately, Mother's behavior resulted in family therapy ending, as more harm than good was occurring. And while Mother said that she had ended her relationship with Father, the caseworker, the CASA, and the GALs all observed his vehicle parked outside Mother's apartment on many occasions.

{¶ 8} The reports filed by the CASA and the GALs echo much of the witnesses' testimony. The CASA and the GALs had observed nothing from Mother that indicated she had gained any insight during the two years since the children were removed. Mother displayed no ownership, accountability, or remorse for her actions. Nor did she acknowledge that there were any problems in the home. They agreed that Mother continued to demonstrate behaviors detrimental to her children's well-being. Neither the CASA nor the GAL believed that Mother and Father had separated.

{¶ 9} The reports both stated that Karen and Jane felt safe and happy in their foster home and that they had asked if they could stay there permanently. By all

accounts, John was well taken care of and was thriving and meeting all developmental milestones. He showed a tight bond with his foster parents and his sisters. The GALs said that Karen and Jane had been very clear that they do not want to return to Mother's care and had expressed a fervent desire to remain where they are to be adopted by their foster parents.

{¶ 10} Both the CASA and the GALs recommended that the court should grant the Agency permanent custody of the children. The GALs' report concluded that Mother has continuously and repeatedly failed to substantially remedy the conditions that caused the children to be removed from the home. The two GALs said that they were not confident that the children would be safe in Mother's care. They concluded that the children needed the permanency and stability that a grant of permanent custody to the Agency would provide. The GALs did not believe that this goal could be achieved any other way.

{¶ 11} On July 12, 2023, the magistrate entered decisions (one for each child) recommending that permanent custody be granted to the Agency. The same day, the juvenile court adopted the decisions and recommendations. Mother filed objections. On November 2, 2023, after a hearing, the juvenile court overruled her objections.

{¶ 12} Mother appealed.

## II. Analysis

{¶ 13} Mother assigns the following error to the trial court:

{¶ 14} THE TRIAL COURT'S DECISION TO GRANT THE AGENCY PERMANENT CUSTODY OF THE CHILDREN IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 15} In her sole assignment of error, Mother argues that granting permanent custody to the Agency was unnecessary and not in the best interest of the children because she has addressed the conditions that led to their removal. Specifically, Mother

claims that she has cut ties with Father, has independent income and housing, and would ensure that the children are safe and had what they needed, including counseling. She also asserts that she would protect her daughters.

### A. The Statutory Framework and Standards of Review

{¶ 16} "R.C. 2151.414 sets out specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." (Citation omitted.) *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. "Before a natural parent's constitutionally protected liberty interest in the care and custody of his child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." (Citation omitted.) *In re M.G.*, 12th Dist. Brown No. CA2022-11-010, 2023-Ohio-1316, ¶ 44.

{¶ 17} As relevant here, under R.C. 2151.414(B)(1), a court must make two findings. One is that a grant of permanent custody is in the child's best interest, and the other finding is that at least one of the circumstances in R.C. 2151.414(B)(1)(a) through (e) applies, which includes that the child has been in the temporary custody of a public children services agency for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d).

{¶ 18} The sufficiency-of-the-evidence and manifest-weight-of-the-evidence standards apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights. *In re Z.C.*, Slip Opinion 2023-Ohio-4703, ¶ 1, 11. Sufficiency and manifest weight are distinct concepts. *Id.* at ¶ 13, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10. When assessing sufficiency, an appellate court should uphold a trial court judgment if the evidence legally supports the jury verdict. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 3. But even if a judgment has sufficient evidence, the appellate

court may find it contrary to the manifest weight of evidence. *Eastley* at ¶ 12. When reviewing for manifest weight, the court considers witness credibility, reasonable inferences, and whether the finder of fact clearly lost its way in resolving conflicts in the evidence resulting in a manifest miscarriage of justice. *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. Deference should be given to the trial court's findings because the trial judge had the opportunity to observe the witnesses and assess their credibility. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). If the evidence permits multiple interpretations, the reviewing court should prefer an interpretation consistent with the verdict and judgment. *Id.* at 80, fn. 3.

### B. Best-Interest Analysis

{¶ 19} R.C. 2151.414(D)(1) sets out a nonexhaustive list of factors the court must consider in determining the best interest of a child:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

A court may also consider additional relevant factors in determining a child's best interest. *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24. No single factor carries greater weight, nor is any factor decisive. *In re S.H.*, 12th Dist. Butler Nos.

CA2020-02-023 and CA2020-02-024, 2020-Ohio-3499, ¶ 30; *In re M.G.*, 12th Dist. Warren No. CA2020-10-070, 2021-Ohio-1000, ¶ 29.

{¶ 20} The magistrate's decision here, adopted by the juvenile court, considered each of the statutory factors and made related findings of fact.

### (a) The children's interactions and interrelationships

{¶ 21} As to the children's relationships with others, the magistrate found that observations of Mother's supervised visits with Karen and Jane "did not reveal a close bond between the girls and their Mother." After the girls learned of Mother's pregnancy, they began to oppose further contact with Mother due to her ongoing relationship with Father, whom they accused of abuse. When Mother named the baby (John) after Father, the girls refused contact with her. By the time the permanent-custody proceedings began, the girls had had no contact with Mother for about a year. Family therapy had not been successful in healing the relationship. Mother says that her children love her and want to be with her and that they are happy to see her, but the weight of the evidence suggests otherwise. Mother does not dispute the findings that the girls have thrived in their foster placement, that "[t]hey appear very bonded with their foster family, with each other, and with their baby brother [John] (who is placed in the same home)."

{¶ 22} Although Mother continued to have visits with John, those visits never extended beyond supervised, limited contact. Although the magistrate found that John appeared to enjoy his time with them, the magistrate also found, based on the testimony, that he had demonstrated emotional distress that was believed to be associated with the visits. Furthermore, John had spent his entire life in foster care with his sisters in a home where he was bonded, settled, and cared for, and with foster parents interested in adopting him and his sisters.

{¶ 23} The evidence shows the lack of a bond between the children and Mother.

It also shows that the children are bonded with their foster parents. Accordingly, this factor favors granting permanent custody to the Agency. Mother does not challenge any of these findings, and the weight of the evidence supports them.

### (b) The children's wishes

{¶ 24} As to the children's wishes, the magistrate found, based on the GALs' report and his own in camera interview, that it was "clear [that] the wish and desire" of the two girls was to be placed in the permanent custody of the Agency. As for John, due to his young age, the magistrate did not interview him, but the magistrate found that the GALs recommended placing him in the permanent custody of the Agency.

{¶ 25} Mother states in her brief that she "knows her children to love her and want to be with her," but the weight of the evidence contradicts this. We particularly note the testimony of Dr. Kim Rosenzweig, the girls' therapist. Dr. Rosenzweig testified that in January 2023 she wrote a letter to the Agency addressing the reunification of the girls with Mother and Father. She noted that Jane had said "multiple times" that she did not want to return to their custody and that Karen had said her "biggest fear" was going back to their home. In the letter, Dr. Rosenzweig strongly encouraged the Agency to consider the children's wishes in their placement. Rosenzweig testified that her opinion remained unchanged.

{¶ 26} Mother does not dispute the magistrate's findings based on his own interviews and the GALs' report. The children's wishes found by the magistrate are supported by the weight of the evidence and favor granting permanent custody to the Agency.

### (c) Custodial history

{¶ 27} Regarding the custodial history of the children, the magistrate found that the two girls were removed from their parents' custody on January 22, 2021, and have been

in the Agency's custody ever since. They were adjudicated as dependent on May 10, 2021. The magistrate found that when the Agency moved for permanent custody on April 20, 2022, the girls had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period. As for the youngest child, John, he was removed on August 16, 2021, and was adjudicated dependent on November 5, 2021. He has remained in the Agency's custody since his removal from the home. The Agency filed the motion for permanent custody of John on October 24, 2022. The magistrate found that by then, John had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period.

{¶ 28} Mother does not challenge any of these findings. We conclude that these facts reflect the evidence and support granting permanent custody to the Agency.

### (d) Legally secure permanent placement

{¶ 29} The magistrate found that granting permanent custody to the Agency was the only way that the children can be provided legally secure permanent placement. Courts have generally interpreted the phrase "legally secure permanent placement" to mean "a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56; *see also In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 59 (6th Dist.) (quoting the same). The magistrate found that the relationship between the girls and Mother was "irretrievably broken." The girls reported that they had been sexually abused, trafficked, and exploited by Father, and physically abused by Mother. Mother said that she believed the girls' claims of sexual abuse, but her actions belied that belief. Even after the girls reported the abuse, she remained in a relationship with Father for some time. Indeed, she bore his child and named the baby after him. The magistrate also noted that significant evidence was presented showing that Mother had remained in a relationship with him, despite her

claims to the contrary. In sum, the magistrate stated, "[t]hose acts clearly demonstrate with whom mother's loyalties lie."

{¶ 30} This is the only factor that Mother truly disputes. Mother contends that the conditions that led to removal have been remedied because she has removed Father from the home, has a stable income and housing, and can meet the needs of the children. The weight of the evidence, though, supports the magistrate's findings.

{¶ 31} The caseworker's testimony is especially pertinent. She testified that the children could not be returned to the parents because "there has not been * * * progress with ensuring that the girls are going to be, and [John], * * * that they're going to be safe. [The parents] have continued to deny that there were any issues in the home and because of that denial have made very little progress in the case plan services that they were * * * recommended to complete." The caseworker testified about two reports from the Mayerson Center at Cincinnati Children's Hospital, based on their interviews with the girls, discussing the physical and sexual abuse. Karen had disclosed an incident at a party (not in Mother's home) where a man "took her into a bedroom and had touched her on her vagina underneath her clothing." Karen said that she had told Mother about this but that the man was still permitted to come to Mother's home later and have access to the girls. Mother told the girls just to lock their bedroom doors. Mother has never acknowledged believing Karen about this incident. The caseworker also testified that Karen had said that she would be taken to parties or social gatherings and that Father "would offer her up to men in exchange for money."

{¶ 32} The evidence shows that Mother has gone "back and forth" regarding whether she believes that the girls were sexually abused. The caseworker's opinion was that there had been no improvement in Mother's ability to protect the children and that she was "very concerned" about Mother's ability to do so. Even though the girls accused

Father of physical and sexual abuse, Mother continued to live with him until shortly before John was born. After John was removed from the home, they resumed living together, claiming to have separated again sometime later. But the caseworker testified that she had seen one or more of the vehicles driven by Father at Mother's residence "fairly frequently." Moreover, the caseworker identified a traffic ticket issued to Father that was dated 11 months after he claimed to have moved out, and it listed his address as Mother's.

{¶ 33} The caseworker described the three children as "very, very bonded" in their foster home and also noted that both girls were thriving there. She said that the Agency had no concerns about the home. The foster mother testified that, if the opportunity arose, she and her husband would like to adopt all three children.

{¶ 34} Mother says that she will protect the girls in the future, but her history suggests otherwise. As the magistrate found: "The evidence is clear that mother was aware, before the case was filed, that at least one of the girls had concerns about being inappropriately touched by [Father]. At that point, [Mother] made some choices. She did not contact the authorities. She did not confront [Father]. She, instead, told her daughters to lock the door to their bedroom. She tries to simultaneously protect her girls and [Father] * * *."

{¶ 35} When assessing evidence, the finder of fact determines witness credibility and assigns weight to their testimony. *In re J.F.*, 12th Dist. Butler No. CA2023-06-065, 2023-Ohio-4244, ¶ 25 (concluding that "[a]lthough Mother presented some favorable testimony at trial, * * * the juvenile court did not err in concluding that it was outweighed by other evidence of Mother's severe and ongoing mental health problems and her inability to provide appropriate care to [the child]"). We see no reason here to disturb the magistrate's assessment of the evidence.

{¶ 36} Based on the evidence, we conclude that the magistrate's findings

regarding the children's need for legally secure permanent placement support granting permanent custody to the Agency.

### (e) The factors in R.C. 2151.414(E)(7)-(11)

{¶ 37} The factors in R.C. 2151.414(E)(7) through (11) relate to a parent's criminal convictions or guilty pleas for offenses against the child, withholding medical treatment or food, endangering the child due to substance abuse, abandonment, and involuntary termination of parental rights regarding the child's sibling. *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, at ¶ 19. The magistrate here made no findings related to these factors.

{¶ 38} In sum, the magistrate found that Mother has failed continuously and repeatedly to substantially remedy the conditions that caused the children to be placed outside of their home. *See* R.C. 2151.414(E)(1). Although Mother has participated in case-plan services, there seems to be no improvement in her ability to parent the children appropriately. Indeed, Mother initially denied the existence of the problems in the home that led to the children's removal. Her actions still indicated either disbelief or lack of understanding regarding what had happened to the girls. During visits with the girls, Mother was instructed not to discuss the case, but she did so surreptitiously, and consequently her relationship with the girls suffered. Mother claimed to have ended her relationship with Father, yet after their reported separation, Father's vehicle was seen parked outside Mother's apartment multiple times.

{¶ 39} Mother contends that the juvenile court lacked a basis for finding abuse and for refusing to return custody of the children to her, even after the abuse allegations were withdrawn and she actively participated in case-plan services. Testimony from multiple witnesses confirmed that the girls consistently alleged abuse. And the evidence showed that an investigation is ongoing into the allegations that Father trafficked the girls. Moreover, completing case-plan requirements does not automatically preclude granting

permanent custody to a social services agency. *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. This is because "[a] case plan is merely a means to a goal and not a goal in itself." *In re S.U.*, 12th Dist. Clermont No. CA2014-07-047, 2014-Ohio-5166 ¶ 35. The focus lies in whether the parent has substantially addressed the concerns that led to the child's removal. *In re S.M.* at ¶ 24. The evidence here clearly and convincingly demonstrates that the problems that led to the children's removal have not been substantially resolved.

### C. The "12 of 22" Findings

{¶ 40} Mother has not challenged the juvenile court's determination that under R.C. 2151.414(B)(1)(d), the children have been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. For this reason, we need not consider the issue further. *See In re J.N.L.H.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 26.

{¶ 41} We note simply that the record here establishes that the magistrate's "12 of 22" finding was supported for each child. The Agency's motions for permanent custody of Karen and Jane were filed on April 20, 2022, which is about 13 months after they entered the Agency's custody, as defined by R.C. 2151.414(D). As for John, the Agency's motion for permanent custody of him was filed on October 24, 2022, which is just over 12 months after he entered the Agency's custody.

### III. Conclusion

{¶ 42} In light of the foregoing, we conclude that the juvenile court did not err by determining that it was in the children's best interest to grant permanent custody to the Agency. As such, we find that the juvenile court's decision to grant permanent custody of the children to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's sole assignment of error is

overruled.

{¶ 43} The juvenile court's judgments are affirmed.


S. POWELL, P.J., and HENDRICKSON, J., concur.