[Cite as *In re D.S.*, 2022-Ohio-998.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

IN RE:                                              :

    D.S., et al.                              :          CASE NOS.  CA2021-10-030
                                                CA2021-10-031

                                         :

                                         :              O P I N I O N
                                                   3/28/2022

                                         :

                                         :

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 20183126 and 20183122

Andrew T. McCoy, Clinton County Prosecuting Attorney, and William C. Randolph, Assistant Prosecuting Attorney, for appellee, Clinton County Children Services.

Craig Newburger, for appellant.

**BYRNE, J.**

{¶1}    Appellant ("Mother"), the biological mother of minor children Dean and Diana, appeals from a decision of the Clinton County Court of Common Pleas, Juvenile Division, which granted permanent custody of Dean and Diana to the agency.[1] For the reasons

---

1. The parties' briefs refer to the children by their initials.  For further privacy and for readability, we are using fictionalized first names to refer to the children as well as some of the adult individuals discussed in the opinion.

outlined below, we affirm the juvenile court's decision.

## I. Procedural and Factual Background

### A. Emergency Shelter Care Hearing and Complaints

{¶2} In December 2018, following an emergency shelter care hearing, a magistrate ordered that Dean, then 17 months old, and Diana, then 4 months old, be placed into the temporary custody of Clinton County Children Services ("CCCS" or "the agency").

{¶3} Following the hearing, CCCS filed complaints alleging that Dean and Diana were abused, neglected, and dependent children.

{¶4} The complaint regarding Dean alleged that CCCS had received a report that there was a 2-year-old child (Dean) in need of medical attention. CCCS responded to the request and contacted a male individual ("Ken") who stated that Mother had come to his residence with the child at 2:30 a.m., two days earlier, that she had only been there for five minutes, and that she had shown up hysterical, saying someone stole money from her. She had then left child with Ken.

{¶5} Ken informed CCCS that the child had been having watery diarrhea, felt feverish, and was congested and wheezing. Ken stated that the child was sick when he arrived and that he had no paperwork for custody or means to contact Mother. Ken reported that the child had no clothing.

{¶6} Ken provided CCCS with Mother's name (although it was misspelled). CCCS then tried to identify Mother but failed to do so. CCCS also did not know the child's name or birthday.

{¶7} The complaint alleged that a police officer who responded to the report found a restraining order identifying Mother's name and listing three children, which included a child of a similar age as Dean. Still, the agency could not confirm that the child left with Ken

was Dean. The child was placed into the temporary custody of CCCS and transported to a hospital, where he was diagnosed with bronchitis requiring a steroid medication.

{¶8} After Dean was transported to the hospital, Mother contacted the police and then spoke with an agency caseworker. Mother confirmed the child's identity as Dean but refused to give the caseworker her address or any information about her other children.

{¶9} The agency was then able to identify Mother and found that she had an open child protective services case after having given birth to a child who tested positive for marijuana.[2] The agency had been unable to contact Mother since the opening of that case.

{¶10} The complaint regarding Diana repeated all the allegations about Dean and added that Diana was Dean's sibling. The complaint further alleged that Mother had tested positive for marijuana and benzodiazepines after the shelter care hearing.[3]

### B. Case Plan, Adjudication, and Motion for Permanent Custody

{¶11} In January 2019, the agency filed a case plan for reunifying the children with Mother. The case plan identified the agency's concerns. The case plan stated that Mother was leaving her children with strangers while she went to work and that she was not attending to the children's medical needs. The case plan also stated that Mother had been a victim of domestic violence on multiple occasions and that the children had been present during these incidents of violence. The case plan stated that Mother required drug and alcohol treatment as she had tested positive for marijuana and benzodiazepines. Finally, the case plan stated that Mother was homeless and unable to provide for the children's basic needs.

---

2. The record is unclear on this point, but given the timing, the child who tested positive was likely Diana.

3, The record reflects that a third sibling, age five, was also removed from Mother's custody and placed in the agency's temporary custody. That child was placed with a relative and the disposition of her custody is not at issue in this appeal.

**{¶12}** The case plan stated that Mother would need to complete age-appropriate parenting classes. The case plan further required Mother to complete all recommended parenting class work and homework. The plan required Mother to attend and actively participate in domestic violence classes and follow through with the recommendations of the provider. The case plan required Mother to complete a drug and alcohol assessment and follow its recommendations. The case plan further required Mother to submit to drug screens as requested. Finally, the case plan required Mother to maintain safe, stable housing for at least three months.

**{¶13}** The agency provided Mother with weekly visitation with the children in an agency setting.

**{¶14}** In February 2019, the juvenile court adjudicated Dean and Diana neglected children. The juvenile court dismissed the claims of abuse and dependency.

**{¶15}** The record reflects that Mother was slow to progress on her case plan objectives. As will be detailed below, Mother exercised her visitation rights sporadically. The juvenile court granted multiple six-month extensions of temporary custody to CCCS. In June 2020, the court granted CCCS its final extension of temporary custody.

**{¶16}** In January 2021, CCCS moved for permanent custody. The motion alleged that Mother abandoned the children, that the children had been in CCCS' temporary custody for more than 12 months of a consecutive 22-month period, and that a grant of permanent custody to the agency was in the children's best interests. The motion stated that while Mother had made progress on her case plan for reunification, she had not shown a commitment to the children through regular and consistent visits and contact.

**{¶17}** Before the hearing on permanent custody, the children's guardian ad litem filed a report recommending that the juvenile court grant permanent custody to CCCS.

## C. The Permanent Custody Hearing

{¶18} The juvenile court held the permanent custody hearing in June 2021. CCCS presented the testimony of two caseworkers assigned to the case.

### 1. Caseworker Testimony

{¶19} The first caseworker testified that removal occurred because Mother left Dean and Diana with Ken, who had a background of domestic violence.[4] Ken had no way of contacting Mother and could not continue to care for the children. Mother left the children with Ken on a Tuesday, and they were still with him two days later.

{¶20} Since December 2018, when the children were removed, they had remained in CCCS' temporary custody. They were placed with their current foster parents in April 2019, where they remained as of the hearing date more than two years later.

{¶21} Mother's case plan for reunification included objectives of attending domestic violence and parenting classes, counseling for substance abuse concerns, and obtaining and maintaining stable housing and employment. For one year following removal, the agency had concerns with Mother's housing stability.

{¶22} Beginning in late 2019 and early 2020, Mother started making progress on her case plan objectives. In 2019, she started working at a Taco Bell. And while she moved between several different residences between January 2020 and April 2020, those residences were all stable and appropriate.

{¶23} In March 2020, Mother was working at a restaurant at the start of the pandemic. She then did not work and began receiving unemployment benefits. In April

---

4. The complaints did not say that Mother left Diana with Ken. The complaints did not identify Diana's location at removal and the record is otherwise unclear as to this issue.

2020, she began living at a residence in Dayton, where she resided for the rest of the case. In October 2020, unemployment benefits ended, and Mother began working third shift at a warehouse near Vandalia, Ohio.

{¶24} Mother completed her required parenting and domestic violence classes. It took Mother until June 2020 to complete a substance abuse/mental health evaluation. That evaluation resulted in a recommendation that she seek outpatient mental health treatment but stated that she did not need substance abuse counseling. Subsequently, a mental health provider determined that Mother did not need mental health treatment at the time.

{¶25} The caseworker testified that despite Mother's (delayed) progress in completing the objectives of her case plan, the agency was still pursuing permanent custody and adoption. CCCS had two primary concerns. First, Mother had not demonstrated a commitment to the children by consistently exercising visitation. Second, Mother remained unable to provide the agency any assurance as to how the children would be cared for while Mother was at work.

{¶26} A second caseworker testified about Mother's issues with visitation. Between April and June 2019, the agency scheduled Mother for two visits with the children per week. However, beginning in June 2019 and through December 2019, the agency reduced Mother's visits to one per week due to the number of times Mother missed or cancelled visits.

{¶27} The second caseworker testified that parents were required to confirm a scheduled visit one business day prior, and before 4 p.m. To confirm a visit, parents were required to leave a message on the confirmation line. On 19 occasions, Mother failed to confirm her visit and therefore the visit was cancelled. On 9 occasions, Mother confirmed a visit, but then failed to appear.

{¶28} The agency has a policy for parents who routinely fail to show for visitation. Such parents are required to arrive at the visitation center one hour before the visit. Mother was placed on this policy. The second caseworker stated that it was "very infrequent" that the agency would employ this policy. Mother was placed on this policy from February 2020 through October 2020.

{¶29} In March 2020, the agency ended in-person visits due to the pandemic. That said, the agency allowed virtual visits.

{¶30} Mother's visits were always supervised and never progressed to unsupervised. The caseworker explained that Mother's visits never progressed to unsupervised because it took her from December 2018 until 2020 to start making progress on her case plan for reunification. And then, when she did begin to make progress on her case plan, her attendance at visits continued to be very inconsistent.

{¶31} A caseworker tallied all potential in-person and virtual visits the agency scheduled for Mother and the children. The caseworker's tally excluded visits that had to be cancelled because of COVID-19 concerns, because the children were sick or unavailable, because Mother was sick or could not obtain a COVID-19 test, or because of snow. Excluding those visits, the caseworker testified that CCCS scheduled 81 in-person visits with the children. Mother attended only 51 of the 81. CCCS also scheduled 78 virtual visits. Mother attended only 22 of the 78.

{¶32} The caseworker testified that Mother had no contact with the children in between a virtual visit on February 2, 2021, and a virtual visit on May 19, 2021, a period of 106 days. In fact, the caseworker testified that Mother had not seen the children in person at all in 2021—that is, for nearly half a year before the permanent custody hearing. In 2021, there were 41 potential visits, of which Mother attended only 5, all virtually. She had 14

scheduled in-person visits in 2021 and attended none.

{¶33} Besides the visitation issue, the second caseworker testified about CSSS' concern that Mother had not shown a change that would prevent the children from being placed with inappropriate individuals while she was working. The second caseworker testified about various individuals who Mother suggested could watch the children and whom the agency investigated.

{¶34} Mother suggested her cousin. But this man had a significant criminal history, including domestic violence charges and involvement with children's services.

{¶35} Mother then suggested her cousin's mother. The agency found that the cousin's mother would have been able to watch the children overnight but could not watch the children when Mother would be home from work and needing to sleep.

{¶36} Mother suggested her sister. However, the sister lived one hour and twenty minutes away from where Mother lived. The caseworker testified that she tried to help Mother understand that it would not be a good idea to have to drive the children to her sister's house one hour and twenty minutes away, return to the Dayton area for work, then return to her sister's home after work, then return to the Dayton area with the children, every day she worked. Mother did not seem to understand the problems with her suggestion.

{¶37} Finally, Mother suggested a man she knew named "Ron."[5] The agency researched Ron in their system and found nothing concerning. But CCCS caseworkers had been unable to speak with Ron about the case due to Mother not coming into the agency to sign a release.

{¶38} CCCS had also investigated two family members as possible placements, but

---

5. Mother's relationship with Ron is not clear. She identified him as being "family" but how he is related to her is unclear. She later identified him as the cousin of her boyfriend.

those individuals had withdrawn themselves from consideration or were determined to be inappropriate placements.

{¶39} Finally, the second caseworker testified that the children were bonded with one another, that they had a good relationship with their foster parents, and that they were bonded with their foster parents.

{¶40} On cross-examination, the caseworker acknowledged that Mother, for a time, ended her third shift work schedule at 7 a.m. and that the agency had scheduled visits for 9 a.m. to 11 a.m. Mother's counsel questioned whether CCCS was concerned that Mother's visits were scheduled so soon after her shift ended and would require her to travel to Clinton County from Vandalia, Ohio. The caseworker responded that Mother had never informed CCCS that she could not make the visits and had indicated that she planned to be awake during that time anyway to take care of the children when she regained custody.

### 2. Mother's Testimony

{¶41} Mother testified that she started working at a Taco Bell two months before the hearing and was also working the third shift at a warehouse in Vandalia, Ohio. She explained that she could not make visits in the fall of 2020 due to her schedule of getting off work at the warehouse at 7 a.m. and having to be in Clinton County at 9 a.m. She claimed that she requested a time change for the visits but was "ignored." Mother admitted she missed a lot of visits but indicated that some of the missed visits were because of COVID-19 and that she had suffered bronchitis.

### D. Juvenile Court's Entry and the Guardian Ad Litem

{¶42} Following the hearing, the juvenile court issued an entry. The court found that the children had been in the agency's custody for 30 months and that Mother had no contact with the children between February 2, 2021, and May 19, 2021—a period of 106 days—

and had thus abandoned the children as defined in R.C. 2151.414(B)(1)(b).

**{¶43}** That said, the court noted that Mother had completed her case plan, had been employed, had maintained housing for over a year, and had done "a lot of things right." The court observed that this progress occurred during the COVID-19 pandemic. The court also noted that Mother was working third shift and CCCS had set her visits out only two hours after she got off work and that she had to drive from one hour away. Finally, the court noted that CCCS had only changed the timing of those visits two weeks before the hearing. For these reasons, the court found that Mother might have a valid excuse for the missed visitations. The court therefore continued the permanent custody hearing in progress. In the meantime, the court ordered Mother to develop a childcare plan for when she was at work to satisfy CCCS' concerns and ordered the agency to increase Mother's visits.

**{¶44}** Before the resumed hearing, the children's guardian ad litem filed a report once again recommending that the juvenile court grant permanent custody to CCCS. The guardian ad litem noted that Mother had missed visits since the court continued the permanent custody hearing, that Mother had no bond with the children, and that Mother had been vague as to how she would provide for care for the children upon their return.

### E. Resumed Permanent Custody Hearing

**{¶45}** In August 2021, the juvenile court resumed the permanent custody hearing. A CCCS caseworker and Mother testified.

### 1. Caseworker Testimony

**{¶46}** The caseworker discussed why the agency scheduled Mother for visits with Dean and Diana on Friday mornings. The caseworker explained that the agency scheduled the visits for that time because Mother had informed the agency she worked Thursday evenings and that her plan after obtaining custody of the children was to be awake on Friday

mornings to take the children to Hillsboro where her sister lived. That Friday visitation schedule was maintained until June 2021, when Mother requested that her visitations be changed to Wednesday mornings because that was her day off work. CCCS changed the visitation schedule as requested. However, Mother failed to confirm for the very first Wednesday visitation.

{¶47} Following the first hearing on permanent custody, CCCS increased Mother's visits to twice a week. Of 15 potential visits scheduled between the first and second permanent custody hearings, Mother attended only 10.

{¶48} The caseworker explained the circumstances of the five visitations that Mother did not attend. Mother missed one visit after she called and said she was sick. Mother missed a second visit after she said she would be late because the agency was making her bring food to the visit (for the children) and she still needed to get her check cashed. The agency cancelled the visit when Mother did not appear on time. Mother missed a third visit after she called in saying she was sick and would not wear a mask because wearing a mask will "make it worse." The agency offered to do a virtual visit that day, but Mother stated she could not make it due to work. CCCS agreed to set up a make-up virtual visit at 2 p.m. that Friday and coordinated with the children's foster parent. However, Mother did not appear for the virtual visit and called approximately one hour and one half after the scheduled time and reported that she did not call in because she was driving in a "dead spot." Mother failed to confirm for a fourth visit. Mother missed a fifth visit after she had shown proof of a negative COVID-19 test but informed the agency that she was "still spitting up green stuff." The agency decided to cancel the visit because it was not worth risking the children's health.

{¶49} The caseworker testified that Mother continued to tell CCCS that her childcare

plan was to rely on Ron, whom the agency had been unable to contact previously because Mother had not signed a release. Mother did sign a release in July, and since then, the caseworker had attempted to contact Ron numerous times. The caseworker called him on July 14. The call went to voicemail, and she left a voicemail. Ron did not return her call. The caseworker called Ron two more times in July. He did not return the caseworker's call.

{¶50} At the end of July, the caseworker contacted Mother and reported her problems reaching Ron. Mother said she would talk to him. The caseworker never heard back from Ron but continued calling him and leaving voicemails. The caseworker contacted Ron three more time in August, before the hearing.

{¶51} The day before the hearing, the caseworker called Ron and left a voicemail. She also separately texted Mother about her failed efforts. Ron finally responded, leaving a voice message with the caseworker after hours, in which he simply stated that he was contacting her "regarding [Mother]."

{¶52} The caseworker called Ron back the morning of the hearing and left another voicemail. Following this, she twice observed a call come in from Ron's number, which calls would immediately end. She called his number back and the call was directed to voicemail. She had heard nothing from Ron since.

{¶53} The caseworker testified that the children's foster mother reported that the increase in visits with Mother was having negative effects on the children. Dean was reporting stomach pain when arriving at the visitation and that both children were noticeably "clingy" after visits with Mother.

{¶54} On cross-examination, the caseworker testified that the day before the resumed hearing, Mother had informed her that she would no longer be working third shift at the warehouse, and instead would be working a day shift at Taco Bell. Mother further

informed her that Ron and her boyfriend – Cody – would assist her with watching the children. The caseworker did not know that Cody was part of Mother's childcare plan until Mother informed her the day before the resumed hearing. The agency did not have a release allowing the caseworker to speak with Cody about the case.

## 2. Mother's Testimony

**{¶55}** Mother testified about her childcare plan, stating that Ron would be staying at her home and helping with the children and that Cody would help as well. Both men worked night shifts and either would watch the children while she was working days at Taco Bell.

**{¶56}** On cross-examination, Mother was asked when either Ron or Cody could sleep if they had to watch her children. Mother stated that some days she presumed they would just not sleep.

## F. Juvenile Court's Permanent Custody Decision

**{¶57}** After taking the matter under advisement, the juvenile court granted CCCS' motion for permanent custody. In so doing, the juvenile court determined that Dean and Diana had been in the temporary custody of the agency for 30 months, and therefore had been in the agency's temporary custody at least 12 months of a consecutive 22-month period. The juvenile court further found that Mother abandoned Dean and Diana by failing to visit or maintain contact with them for more than 90 days, from February 2, 2021, to May 19, 2021. Finally, the juvenile court determined that CCCS had proved by clear and convincing evidence that a grant of permanent custody to CCCS was in the children's best interests.

**{¶58}** Mother appealed the juvenile court decision and presents the following single assignment of error.

## II. Law and Analysis

{¶59} Assignment of Error:

{¶60} THE TRIAL COURT'S FINDING UNDER R.C. 2151.414 THAT A GRANT OF PERMANENT CUSTODY TO CCCS IS IN [THE CHILDREN'S] BEST INTEREST WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶61} Mother argues that the juvenile court's decision to grant permanent custody to the agency was not supported by clear and convincing evidence. Specifically, Mother contends that the juvenile court's permanent custody decision failed to consider whether Mother's case should have been stayed for an additional six months due to the COVID-19 pandemic. Mother also contends that the record does not support the court's finding on abandonment and that she maintained contact with her children via video calls between February 2 and May 19, 2021.

{¶62} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the

judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

**{¶63}** In determining whether a juvenile court's decision is against the manifest weight of the evidence in a permanent custody case, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.*, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is most favorable and consistent with the verdict and judgment. *Eastley* at ¶ 21.

**{¶64}** Under R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, under R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any one of the following applies: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either

parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

**{¶65}** The phrasing of Mother's assignment of error suggests she is arguing that a grant of permanent custody was not in the children's best interest. However, while she cites case law concerning the required best interest finding in a permanent custody case, Mother presents no argument concerning best interests in the body of her brief. Nor does Mother challenge the court's finding that Dean and Diana were in the temporary custody of the agency for at least 12 months of a consecutive 22-month period. As discussed above, the body of Mother's brief only challenges the court's finding of abandonment and argues that the court should have extended the permanent custody hearing another six months.

**{¶66}** The juvenile court's unchallenged findings that Dean and Diana were in the temporary custody of the agency for at least 12 months of a 22-month period and that it was in the children's best interests to be placed in the permanent custody of the agency are, by themselves, sufficient to meet the two-part test for permanent custody in R.C. 2151.414(B)(1). In other words, because Mother does not challenge the trial court's best interests and 12-of-22-months findings on appeal, and because those findings were enough for the trial court to award permanent custody to the agency, we may affirm the trial court's decision without the need to conduct any further analysis. *In re A.W.* at ¶ 12. That said, in the interest of justice and the children's welfare, we will substantively review the grant of

permanent custody.

{¶67} We have carefully and thoroughly reviewed the evidence in this case. We find that the juvenile court's determinations that the children were in the temporary custody of the agency for the requisite period under R.C. 2151.414(B)(1)—12 months of a 22-month period—and that an award of permanent custody to CCCS is in the best interests of the children are supported by clear and convincing evidence and are not against the manifest weight of the evidence.

{¶68} As correctly determined by the juvenile court, the evidence shows that the children were in the temporary custody of the agency for 30 months—well above the number of months required by R.C. 2151.414(B)(1)(d).

{¶69} Regarding best interests, the evidence reflected that Mother made progress on her case plan, notably achieving stable employment and housing. However, she failed to make a commitment to her children, as demonstrated both by her many failures to visit with the children and by her lack of effort in assuring the agency that the children would not be subject to the same conditions that caused their removal. *See* R.C. 2151.414(D)(1)(a) (best interest factors include "the interaction and interrelationship of the child with the child's parents * * * and any other person who may significantly affect the child"). More than two years after the children were removed in part because Mother left the children with a stranger (who had a history of domestic violence), Mother was still unable to account for how the children would be cared for while she was working. All the childcare providers Mother suggested were inappropriate. In the case of Ron, the evidence was clear that he was not interested in being involved in Mother's childcare plan.

{¶70} Given Mother's progress on aspects of her case plan, it may be troubling, on the surface, that she did not achieve reunification. But part of the problem here was

Mother's delay in making progress on her case plan. When she finally did start to make progress, over a year after the children's removal, any progress was undermined by her inconsistency with visitation. Mother missed many visits which she confirmed, and to which the children were transported by their foster parents. Mother's missed visits were so frequent that she was placed on a plan that the agency rarely had to employ, designed specifically for parents who often miss visitations. Mother's complete lack of contact with her children for over three months in 2021 is unfortunately emblematic of her lack of commitment to her children.

{¶71} But this case is not defined simply by numerous missed visits. The missed visits reveal a lack of commitment, but the issue was further complicated by the children's young age at removal. As a result of missed visitations and the children's age, the evidence was clear that the children did not develop a bond with Mother during these formative years. And given that the children remained young and incapable of fending for themselves, Mother's failure to have any reasonable plan for childcare underscores the agency's concerns that the children, if returned, would likely face the same situation of being left with strangers and inappropriate people while Mother worked.

{¶72} Mother's argument that the court should have continued the permanent custody hearing another six months because of the pandemic lacks merit. Citing the pandemic, the juvenile court had already continued the hearing in progress to allow Mother another two months to make progress towards reunification and specifically to assuage the agency's concerns over childcare. No significant changes in Mother's behavior occurred during that time as Mother continued to miss a significant number of scheduled visitations. The children deserve permanency and have been in the agency's temporary custody for most of their lives. R.C. 2151.414(D)(1)(c) and (d) (best interest factors include "the

custodial history of the child" and "the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency").

{¶73} Moreover, an additional six-month extension of temporary custody would not have been permitted under R.C. 2151.353(G) and 2151.415(D)(4), both of which prevent a court from ordering an extension of temporary custody more than two years after the date the children were placed in shelter care. The children were placed in shelter care in December 2018 and the permanent custody hearing took place in mid-2021.

{¶74} Finally, Mother claims that the court's finding on abandonment was not supported by the evidence. Again, as discussed above, Mother did not challenge the court's best interest finding or the 12-of-22-months finding, which findings were sufficient to grant permanent custody. In this case, abandonment was simply another finding supporting the grant of permanent custody.

{¶75} Regardless, Mother claims that she maintained contact with the children between February 2, 2021, and May 9, 2021, and suggests that she had virtual visits during this time. Yet she cites no portion of the record supporting her assertion that she had virtual contact with the children during this time. We have reviewed the record and we find no support for Mother's assertion. The evidence was unrefuted that Mother had no contact with the children, virtual or otherwise, during the relevant February to May 2021 period.

{¶76} Having found no merit to Mother's argument, we overrule Mother's sole assignment of error.

### III. Conclusion

{¶77} For all these reasons, we find that the juvenile court's grant of permanent custody was supported by sufficient credible evidence and was not against the manifest

weight of the evidence.

**{¶78}** Judgment affirmed.


S. POWELL, P.J., and HENDRICKSON, J., concur.