[Cite as *In re D.D.*, 2024-Ohio-2769.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY

IN RE: :

D.D. : CASE NO. CA2024-03-005

: O P I N I O N
7/22/2024

:

:

:

APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20223053

Melissa K. Schindler, for appellant.

Martin P. Votel, Preble County Prosecuting Attorney, and Sean Brickman, Assistant Prosecuting Attorney, for appellee.

**M. POWELL, J.**

{¶ 1} Appellant ("Mother"), the mother of minor child D.D. ("David"), appeals the decision of the Preble County Court of Common Pleas, Juvenile Division, granting permanent custody of David to the Preble County Department of Job and Family Services

("the Agency").[1]  For the reasons outlined below, we affirm the juvenile court's decision.

## I. Factual and Procedural Background

{¶ 2}  David was born on January 28, 2020.  Shortly after his birth, Mother experienced medical issues that led to open heart surgery.  As a result, she placed David in the care of his maternal grandmother.  David's father left home a couple of weeks after he was born and, according to Mother, may be in India.

{¶ 3}  The Agency became involved with the family in November 2022 when it received a report of concerns about grandmother's care of David.  The pair had been evicted from a domestic-violence shelter because drug paraphernalia had been found in their room and grandmother had been giving David melatonin.  On November 2, the Agency removed David from grandmother's care and obtained temporary custody, placing him in a Preble County foster home.  The Agency filed a dependency complaint two days later, and David was adjudicated dependent on February 27, 2023, with temporary custody remaining with the Agency.

{¶ 4}  The Agency developed a case plan for Mother, which required her to complete a mental health assessment, drug and alcohol assessment, psychological evaluation, parenting education, and case management services.  Mother's compliance with the case plan was limited.  She completed a mental health assessment.  She reported no problems despite telling her caseworkers that she suffered from anxiety and depression that affected her ability to hold a job and meet her needs. The Agency asked Mother to be re-assessed, but it received no verification that she had done so.  Mother told the Agency that she was engaged in therapy but again provided no verification.

---

1. "David" is a pseudonym adopted for this opinion for the purposes of privacy and readability.  *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.).

Mother was advised to take medication for her anxiety, but she declined to do so. She also completed a drug and alcohol assessment, which recommended no services. But she tested positive for amphetamines, methamphetamines, and THC (the principal psychoactive component of marijuana) in August and THC in November 2023. Mother did not complete a psychological evaluation. Although she completed parenting classes, the Agency was unable to assess whether her parenting skills had improved because Mother never visited David in person.

{¶ 5} The Agency struggled to maintain consistent contact with Mother. Throughout the pendency of the case, she did not have stable housing or income. She lived in Warren County, Ohio, and lacked her own transportation. This stymied the Agency's efforts to arrange in-person visits between her and David. Mother also said that she did not visit because she was dealing with a lot, was homeless, had no shower, and was embarrassed. Consequently, no in-person visits occurred between Mother and David after his removal. Virtual visits were offered in December 2022, but David, then two years old, had difficulty engaging in them. In any event, Mother attended only 4 out of 27 scheduled virtual visits. The caseworker never saw any bond between Mother and David.

{¶ 6} David remained in the same foster home from November 2022 to January 2024. He developed a strong bond with his foster parents, who expressed an interest in adopting him if permanent custody were granted to the Agency. Under their care, David showed significant improvement in speech, behavior, and health. He began attending preschool, had an IEP (individualized education program), and received speech therapy.

{¶ 7} On August 4, 2023, the Agency filed for permanent custody of David. The juvenile court held a hearing on the motion on January 9, 2024, during which the foster father, the family's two caseworkers, the CASA (Court Appointed Special Advocate), and

Mother testified. One caseworker testified that Mother had reported in August 2023 that she was homeless and living in the woods. At the time of the hearing, Mother had recently claimed to have obtained housing and employment. But according to the caseworker the Agency does not yet consider either stable to enable Mother to meet David's needs. The CASA, who also submitted several written reports during the case, testified that stability was a major concern with Mother and her ability to care for David. The CASA recommended that permanent custody be given to the Agency, believing this to be in David's best interest.

{¶ 8} On February 28, 2024, the juvenile court entered an order terminating the parental rights of both Mother and David's father and granting permanent custody of David to the Agency. The court determined that David could not be placed with Mother within a reasonable period of time or should not be placed with her, for a few reasons. One, Mother had failed continuously and repeatedly to substantially remedy the conditions that led to David's removal, despite reasonable case planning and diligent efforts by the Agency. Two, Mother's mental health issues (anxiety and depression) and substance use affected her ability to provide for herself and David since at least 2014 by preventing her from maintaining stable employment and housing. And three, Mother had demonstrated a lack of commitment to David by failing to regularly support, visit, or communicate with him. The court further determined that David had been abandoned by both of his parents. Mother had no contact with him from at least November 2, 2022, until October 2023, and David's father had no contact with him during the entire duration of the case.

{¶ 9} The juvenile court concluded that it was in David's best interest to grant permanent custody to the Agency. There was a significant bond between David and his foster parents, the court found, and he has shown significant growth and improvement in

- 4 -

their care. Moreover, the foster parents wished to adopt him. The court said that David needed a legally secure permanent placement that only permanent custody would provide. Moreover, Mother had not addressed the issues that existed at David's removal and was not prepared to parent him now or in a reasonable period of time. And despite the Agency's efforts, no relatives had been identified or had filed for placement or custody.

{¶ 10} Mother appealed.

## II. Analysis

{¶ 11} Mother assigns three errors to the trial court's permanent-custody decision, challenging the court's findings that she abandoned David, that he could not be placed with her within a reasonable amount of time, and that it was in David's best interest to grant permanent custody to the Agency.

### A. Applicable law and standards of review

{¶ 12} The termination of parental rights is a grave matter, implicating fundamental liberty interests protected by the Constitution. *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.). Before a state may sever the legal bonds between parent and child, it must satisfy the requirements in R.C. 2151.414, proving its case by clear and convincing evidence. *See In re A.M.*, 2020-Ohio-5102, ¶ 18.

{¶ 13} R.C. 2151.414 establishes a two-pronged test for granting permanent custody to a children services agency. *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.). First, the juvenile court must find that at least one of the five statutory grounds exists. *In re R.B.*, 2022-Ohio-1705, ¶ 31 (12th Dist.). These grounds include a determination that the child cannot or should not be placed with either parent within a reasonable time, R.C. 2151.414(B)(1)(a), and abandonment of the child, R.C. 2151.414(B)(1)(b). Importantly, only one of these grounds need be established. *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.). Second, the court must determine that permanent custody serves the child's best

- 5 -

interests. *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.). This finding reflects the paramount consideration in these cases: the welfare of the child.

{¶ 14} Appellate review of these determinations is appropriately deferential, recognizing the juvenile court's superior position to assess witness credibility and weigh evidence. An appellate court typically inquires whether sufficient credible evidence supports the lower court's decision. *In re A.S.*, 2019-Ohio-4127, ¶ 19 (12th Dist.). In extraordinary cases, however, where the judgment appears manifestly against the weight of the evidence, reversal may be warranted. *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.). This manifest weight review is not a mere reweighing of the evidence. Rather, it asks whether the factfinder has so clearly lost its way as to create a manifest miscarriage of justice. *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. In conducting this analysis, the reviewing court must be mindful of the presumption favoring the juvenile court's findings, particularly in the delicate context of child custody determinations. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). When the evidence permits multiple reasonable interpretations, the reviewing court is bound to adopt the one consistent with the juvenile court's judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

### B. The abandonment finding is supported by the evidence

{¶ 15} The first assignment of error alleges:

> THE TRIAL COURT'S DETERMINATION THAT [DAVID] WAS ABANDONED WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶ 16} Mother first challenges the juvenile court's finding, under R.C. 2151.414(B)(1)(b), that she abandoned her child.

{¶ 17} R.C. 2151.011(C) establishes a clear standard for abandonment: a child is "presumed abandoned when the parents of the child have failed to visit or maintain

contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." The record here is stark. Mother had no contact with David for at least 339 days—from November 2022 until October 2023. Even after limited virtual visits began, her engagement remained sporadic at best. Mother admitted having no contact with David during this timeframe. She attended only 4 of the 27 virtual visits scheduled after October 2023, and she had no in-person contact with David at all during the entire case, from November 2022 through January 2024.

{¶ 18} Mother contends that responsibility for this lack of contact lies with the Agency. She cites geographic distance and lack of transportation assistance as insurmountable barriers to visitation. Mother says that she lived in Warren County and that the child was in a Preble County foster home. She says that she had no way to travel to Preble County for visitations and that the Agency did not provide transportation for her or bring the child to her for visits. Mother claims that the only effort taken by the Agency to assist with transportation was to contact United Transportation Services, which declined to provide transportation because it transports for medical reasons only. Mother also discounts her failure to avail herself of virtual visits because the child was barely three years old, rendering virtual visits meaningless. Finally, Mother claims that she never went more than 90 days without contact with the Agency and had no means to contact the foster family directly. Mother's argument misses the mark in two crucial respects.

{¶ 19} First, it conflates the Agency's duty to make "reasonable efforts" at family reunification with the legal standard for abandonment. While the Agency's efforts may be relevant in some contexts, they do not negate a finding of abandonment under the statute. Indeed, the law explicitly relieves children services agencies of the "reasonable efforts" requirement in cases of abandonment. *See* R.C. 2151.414(B)(1)(b) (abandonment independently justifies a grant of permanent custody).

{¶ 20} The Ohio Supreme Court has said that "various sections of the Revised Code refer to the agency's duty to make reasonable efforts." *In re C.F.*, 2007-Ohio-1104, ¶ 29. But "[u]nder certain circumstances, the law dispenses with the duty to make reasonable efforts to reunify the family." *Id.* at ¶ 34. "Under R.C. 2151.419(A)(2), the agency need not make reasonable efforts if the parent from whom the child was removed . . . has abandoned the child." *Id.* The Supreme Court also held that "except for some narrowly defined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43. The record here shows that the juvenile court made multiple reasonable-efforts determinations throughout this case. Mother could have raised her concerns about the Agency's failures to facilitate visitation to the juvenile court, but she did not.

{¶ 21} Second, and perhaps more fundamentally, Mother's argument misses the mark by taking an impermissibly narrow view of what it means to "maintain contact" with a child. As we have said, abandonment is not solely about physical visitation. *In re J.N.L.H.*, 2022-Ohio-3865, ¶ 41 (12th Dist.) ("R.C. 2151.011[C] does not limit a finding of abandonment to lack of visitation. Rather, the statute addressing abandonment also includes a failure to maintain contact with the child"); *In re B.J. & L.J.*, 2016-Ohio-7440, ¶ 35 (12th Dist.) (stating that "although Mother was no longer able to visit the children after June 2015, Mother was not prohibited from otherwise maintaining contact with the children"). A parent retains numerous avenues to demonstrate continued interest and involvement in a child's life—through letters, gifts, or other forms of communication. *In re J.N.L.H.* at ¶ 41 (stating that the mother was not prohibited from maintaining contact with

the child through forms of contact other than visitation, meaning that the mother "chose not to maintain any contact with her child").  The record before us shows no such efforts by Mother to use other forms of contact to maintain a connection with David.

**{¶ 22}** The juvenile court's finding of abandonment rests on solid evidentiary ground.  It reflects not just the extended period without physical contact, but also Mother's failure to use alternative means of maintaining a connection with her child.

**{¶ 23}** The first assignment of error is overruled.

### C. The finding that David could not be placed with Mother within a reasonable period of time is supported by the evidence

**{¶ 24}** The second assignment of error alleges:

> THE TRIAL COURT'S DETERMINATION THAT [DAVID] COULD NOT BE PLACED WITH HIS PARENTS WITHIN A REASONABLE AMOUNT OF TIME, OR SHOULD NOT BE, WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

**{¶ 25}** Mother next challenges the juvenile court's finding, under R.C. 2151.414(B)(1)(a), that David could not be placed with her within a reasonable period of time or should not be placed with her at all.

**{¶ 26}** R.C. 2151.414(E) enumerates several factors that compel such a finding.  These include a parent's failure to remedy conditions causing the child's removal, chronic mental illness or substance abuse, lack of commitment to the child, and abandonment.  R.C. 2151.414(E)(1), (2), (4), and (10).  The presence of even one factor is sufficient to support the finding that a child cannot be placed with a parent within a reasonable period of time or should not be placed with the parent.

**{¶ 27}** In this case, the juvenile court found all four of the above-listed factors were present.  First, the court found that despite reasonable case planning and diligent efforts by the Agency, Mother failed to substantially remedy the conditions that led to David's

- 9 -

removal. While she completed some assessments, there was no verification of her following through on recommendations, and she continued to use illegal substances. Second, the court identified chronic mental illness and drug use. Mother's anxiety and depression, dating back to at least 2014, have impaired her ability to provide for herself and her child. Her substance use, whether for self-medication or other reasons, has further compromised her capacity to maintain stable employment and housing. Third, Mother demonstrated a lack of commitment to David. For nearly a year, she had no contact with her son. Even when virtual visits were arranged, she attended only 4 out of 27 scheduled sessions. This pattern of minimal engagement speaks volumes about her (lack of) commitment to parental duties. Lastly, the court found that Mother had abandoned David, having had no contact with him for 339 days—far exceeding the 90-day statutory threshold for presumed abandonment.

{¶ 28} Mother again contends that the Agency failed to make reasonable efforts to facilitate reunification, citing lack of transportation assistance and geographically inaccessible service referrals. This argument raises questions about the interplay between a children services agency's duty to make "reasonable efforts" and a parent's responsibility to engage with offered services. Indeed, the Agency's decision to refer Mother to services in a county where she did not reside, without addressing transportation barriers, is troubling. However, the Agency was not required to make "all available efforts" to assist her. *See In re S.U.*, 2014-Ohio-5748, ¶ 16 (12th Dist.) ("'Reasonable efforts' does not mean all available efforts"). And we must also consider Mother's sporadic and often remote contact with the Agency, which undoubtedly complicated efforts to resolve these obstacles.

{¶ 29} In the end, while the reasonable efforts question here presents a closer call, it does not alter the outcome, as the issue is moot. R.C. 2151.414(B)(1)(b) explicitly

states that a finding of abandonment—which the juvenile court found and we have affirmed—independently justifies a grant of permanent custody.

{¶ 30} The second assignment of error is overruled.

### D. The best-interest finding is supported by the evidence

{¶ 31} The third assignment of error alleges:

> THE TRIAL COURT'S DETERMINATION THAT GRANTING PERMANENT CUSTODY TO PREBLE COUNTY JOB AND FAMILY SERVICES, CHILDREN'S SERVICES DIVISION WAS IN [DAVID]'S BEST INTEREST WAS NOT SUPPORTED BY CLEARN AND CONVINCING EVIDENCE.

{¶ 32} Lastly, Mother challenges the juvenile court's finding that granting permanent custody to the Agency was in David's best interest.

{¶ 33} In determining a child's best interest—perhaps the paramount consideration in custody cases—R.C. 2151.414(D)(1) mandates that courts weigh the factors enumerated in the statute. These factors include the child's relationships and interactions, wishes, custodial history, and need for a legally secure placement. R.C. 2151.414(D)(1)(a)-(e). Another factor courts must consider is whether "[t]he parent has abandoned the child." R.C. 2151.414(E)(10); R.C. 2151.414(D)(1)(e) (directing courts to consider whether any factor in R.C. 2151.414[E][7] to [11] applies). Our review of the record reveals that the juvenile court here conducted a thorough analysis of these factors, and its findings are well supported by the evidence.

{¶ 34} Central to the court's determination was David's relationship with his foster parents. The evidence paints a picture of a thriving child who has formed strong emotional bonds with his caregivers, calling them "mom" and "dad" and expressing love for them. This attachment is not merely sentimental; it correlates with significant developmental and physical improvements in David's well-being.

{¶ 35} Contrast this with David's tenuous connection to Mother. The record shows

- 11 -

no in-person contact for over a year before the hearing, and before that, David had been in his grandmother's care. The biological father's presence in David's life is even more nebulous, with no clear evidence of any meaningful contact. While David's young age precludes a direct expression of his wishes, his observed behavior in the foster home—happy and comfortable—speaks volumes. This aligns with the foster parents' desire to adopt David, providing a path to the permanency and stability that every child deserves. The custodial history further buttresses the court's decision. At the time of the hearing, David had been in agency custody for over a year and had not been in Mother's care for more than two years—a significant portion of his young life. No viable relative placements emerged during this time. Critically, the court found that Mother had not addressed the issues that led to David's removal and was not prepared to parent him within a reasonable timeframe. This finding, coupled with the finding that Mother had abandoned David, weighed heavily in favor of granting permanent custody to the Agency.

{¶ 36} In cases involving the termination of parental rights, our review must be exacting. Yet we must also defer to the juvenile court's superior position to evaluate the nuances of family dynamics and a child's best interest. Here, the evidence overwhelmingly supports the court's conclusion that granting permanent custody to the Agency serves David's best interests. While biological ties are significant, they are not determinative. The child's need for stability, security, and nurturing care must take precedence.

{¶ 37} Based on the evidence, we conclude that the juvenile court did not err in determining that it was in David's best interest to grant permanent custody to the Agency.

{¶ 38} The third assignment of error is overruled.

### III. Conclusion

{¶ 39} We have overruled each of the assignments of error presented. The

juvenile court's decision to grant permanent custody of David to the Agency was supported by clear and convincing evidence.  Therefore the court's judgment is affirmed.

S. POWELL, P.J., and HENDRICKSON, J., concur.