[Cite as *In re J.W.*, 2024-Ohio-5142.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| J.W., et al. | : | CASE NOS. CA2024-05-008<br>CA2024-05-009 |
| | : | |
| | : | O P I N I O N<br>10/28/2024 |
| | : | |
| | : | |

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 20193045 and 20193046

The CMW Law Firm, and Anthony D. Maiorano, for appellant.

Andrew T. McCoy, Clinton County Prosecuting Attorney, and Danielle Sollars, Assistant Prosecuting Attorney, for appellee.

**PIPER, J.**

{¶ 1} Appellant ("Grandmother"), the maternal grandmother of minor children J.W. ("James") and J.H. ("Jill"), appeals the decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to the

Clinton County Department of Job and Family Services ("the Agency").[1]  For the reasons outlined below, we affirm the juvenile court's decision.

### I. Factual and Procedural Background

{¶ 2}   The facts of this case paint a picture of instability and recurring issues that have plagued these children's lives for several years.  Nine-year-old James (born September 29, 2015) and 12-year-old Jill (born February 17, 2012) were first removed from their home and placed in the Agency's custody on August 31, 2019.  The children's mother ("Mother") was in prison and the children were in Grandmother's care and living with her.  She had power of attorney over both children.[2]  The police were called, and Grandmother was arrested for domestic violence for inappropriately disciplining James. Two months later, the children were adjudicated dependent.  A case plan was created by the Agency that involved Grandmother.  In January 2020, the children were returned, and Grandmother was granted temporary custody, with the Agency having protective supervision.

{¶ 3}   Over the next few years, the children were removed two more times and custody alternated between the Agency, Grandmother, and Mother.  In December 2021, the children were again removed after Grandmother was hospitalized due to complications from COVID-19.  The children returned home in March 2023.  The following month, Mother, who was living with Grandmother, was granted temporary supervision with Grandmother assisting and the Agency having protective supervision.  But just over

---

1.  "James" and "Jill" are pseudonyms adopted in this opinion for the purposes of privacy and readability. *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.).

2.  Since Mother was incarcerated and the locations of the fathers of the children were unknown, Grandmother was treated as a party.  *See* Juv.R. 2(BB); *In re J.T.S.*, 2015-Ohio-364 (12th Dist.). Grandmother received the benefit of court-appointed counsel, was a party to the case plans created by the Agency and was granted temporary custody of the children at times during the case.

a month later, in June, the children were removed for a third time, after Mother had a mental health crisis in Grandmother's home.

{¶ 4} At the end of June 2023, the Agency filed a motion to remove Grandmother as a party. A hearing was held in July at which several witnesses testified, including the caseworker, the children's Court Appointed Special Advocate ("CASA"), as well as Grandmother's brother, son, and sister. In August, the trial court entered a decision denying the Agency's motion and allowing Grandmother to continue as a party. The court found that Grandmother "has a lot of problems to overcome which include her health, living arrangement, including keeping house, and seems at times to have her priorities wrong." The court questioned whether Grandmother was up to the challenging task of custody and parenting that the children needed. Ultimately, the court gave Grandmother the benefit of the doubt that living with her still could be an option for the children. But the court said that "it will take a lot of life changes, lifestyle changes, and for grandmother to stay healthy before the children's best interest would be to reside with her."

{¶ 5} In October 2023, the Agency moved for permanent custody of the children. A hearing on the motion was held on February 15, 2024. The court heard testimony from the Agency caseworker. The caseworker testified about ongoing concerns with the cleanliness and safety of Grandmother's home, Grandmother's relationship with Mother, and Grandmother's ability to consistently implement parenting skills. Grandmother testified about her desire to care for the children and her efforts to improve her situation. The parties stipulated to the admission of the evidence presented at the hearing to determine if Grandmother should be removed as a party. Initially, Mother opposed the motion for permanent custody, but she withdrew her opposition during the hearing. Disgruntled with the testimony, Mother walked out during the hearing and did not return.

{¶ 6} The court received the written report and recommendation of the CASA. The CASA did not think that placement with Grandmother was in the best interest of the children. Grandmother had been given several chances to provide the care required by the case plan, the CASA noted, but she has never been able to do so. She has not been able to keep a reasonably clean house or provide the appropriate level of care for the children, and the children had to be removed from her care three times. "And so," said the CASA, "it's just been a continual process of not being able to provide sufficient care and a safe environment for the children." The CASA recommended that permanent custody be granted to the Agency.

{¶ 7} On April 3, 2024, the trial court issued its decision granting permanent custody to the Agency, finding that the children had been in the Agency's custody for 12 of the prior 22 months and that permanent custody was in their best interests. The court found that the children's fathers (each child had a different father) had abandoned them. As for Grandmother, the court noted that Mother had lived with Grandmother for substantial periods of time during the case. The relationship between them, though, was "toxic," and their interactions around the children were inappropriate and exposed them to domestic violence. The court noted that despite reporting long-term verbal and physical abuse from Mother, Grandmother had only started working with protective services the week before the hearing. Grandmother had been told by the Agency that Mother should no longer live with her, but Grandmother still allowed Mother to move back in late November 2023. Grandmother testified that Mother did not leave until February 8, 2024, a week before the permanent custody hearing. Grandmother claimed that she would not allow Mother to live with her again, but the court did not believe her. Grandmother, said the court, is unable to put the needs of herself and the children before

the needs of others who appear to require assistance. The court found that Mother was homeless and living in her vehicle and still abusing alcohol.

{¶ 8} Based on the testimony, the trial court noted that the concerns it had expressed in its August 24, 2023 entry had not been alleviated. The court expressed concern regarding Grandmother's continuing health difficulties. The Agency had observed recent declines in the condition of her home as well as her personal hygiene. The court further noted that while Grandmother appeared to have assistance and support from her extended family, the support was inconsistent. The court also pointed out that Grandmother had not filed a motion for custody of the children.

{¶ 9} After considering the various factors required by law, the court determined that it was in the best interest of the children to grant permanent custody to the Agency. Mother and Grandmother had repeatedly failed to remedy the conditions causing the children's removal, and the children could not be placed with Mother within a reasonable time. Indeed, it appeared that Mother no longer wanted custody. Granting the Agency permanent custody, said the court, was the only way that a secure permanent placement could be achieved. Consequently, the court ordered that permanent custody of the children be granted to the Agency, terminating the parental rights of their biological parents.

{¶ 10} Grandmother appealed.

## II. Analysis

{¶ 11} Grandmother assigns two errors to the trial court's permanent-custody decision, arguing that the Agency failed to make reasonable efforts to reunify the family and that the trial court's best-interest finding was not supported by sufficient evidence and was against the manifest weight of the evidence.

- 5 -

**A. Applicable law and standards of review**

{¶ 12} We begin with the standard of review.  The termination of parental rights is a matter of profound constitutional significance, striking at the heart of fundamental liberties safeguarded by our Constitution.  *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.). Before the state may sever the sacred bonds between parent and child, it must satisfy the stringent requirements set forth in R.C. 2151.414, shouldering the burden of proof by clear and convincing evidence.  *See In re A.M.*, 2020-Ohio-5102, ¶ 18.

{¶ 13} The framework established by R.C. 2151.414 demands a two-pronged inquiry before permanent custody may be granted to a children services agency.  *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.).  First, the juvenile court must determine that at least one of five statutory grounds exists.  *In re R.B.*, 2022-Ohio-1705, ¶ 31 (12th Dist.). The establishment of any single ground suffices.  *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.).  These grounds include a determination that "[t]he child has been in the temporary custody of . . . [a] public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period."  R.C. 2151.414(B)(1)(d).  Second, the court must conclude that granting permanent custody to the children services agency serves the child's best interests.  *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.).  This latter determination embodies the paramount consideration in these weighty proceedings: the welfare of the child.

{¶ 14} Appellate review of these determinations is appropriately deferential, acknowledging the juvenile court's unique vantage point to assess credibility and weigh evidence.  The appellate inquiry typically centers on whether sufficient credible evidence buttresses the court's decision.  *In re A.S.*, 2019-Ohio-4127, ¶ 19 (12th Dist.).  In rare

instances, however, where the judgment appears manifestly at odds with the weight of the evidence, reversal may be warranted. *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.). This manifest weight review does not invite a mere rebalancing of the evidentiary scales. Rather, it asks whether the trial court has so clearly lost its bearings as to create a manifest miscarriage of justice. *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

**{¶ 15}** In undertaking this analysis, the reviewing court must remain cognizant of the strong presumption favoring the juvenile court's findings, particularly in the sensitive realm of child custody determinations. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). When the evidence lends itself to multiple reasonable interpretations, the reviewing court is duty-bound to embrace the one consonant with the juvenile court's judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

### B. The Agency made reasonable efforts

**{¶ 16}** The first assignment of error alleges:

**{¶ 17}** THE TRIAL COURT ERRED IN FINDING THAT THE AGENCY USED REASONABLE EFFORTS.

**{¶ 18}** Grandmother first contends that the Agency failed to make reasonable efforts to reunify the family. R.C. 2151.419(A)(1) requires a juvenile court to determine whether the children services agency "has made reasonable efforts . . . to eliminate the continued removal of the child from his home, or to make it possible for the child to return safely home."

**{¶ 19}** The juvenile court here made multiple reasonable-efforts determinations throughout this case. The record shows that the Agency made extensive efforts to reunify the family over the course of several years. These efforts included service referrals,

- 7 -

supervised visitations, transitional visits, in-home visits, and transportation assistance. The Agency provided Grandmother opportunities to engage in mental health and substance abuse treatment, parenting classes, and other supportive services. And she attended mental health and substance abuse treatment programs. But ultimately, the Agency determined that Grandmother would not be a safe and stable placement option.

{¶ 20} While it is true, as Grandmother contends, that the Agency did not conduct a formal kinship placement study with her, the caseworker testified that no study was done due to the Agency's belief that Grandmother's home would fail an inspection. In any event, not conducting such a study alone does not negate the Agency's overall efforts to work towards reunification.

{¶ 21} The court's custody decision is based on a broader assessment of Grandmother's situation rather than solely on the absence of a formal home study. Grandmother continued to allow Mother to live in the home against the Agency's advice. The Agency repeatedly told Grandmother that she had to keep her home clean, which she did not do consistently. Thus the recurring issues with home conditions and the volatile relationship between Grandmother and Mother persisted despite the Agency's interventions. "[T]he Agency was not required to make 'all available efforts' to assist her." *In re D.D.*, 2024-Ohio-2769, ¶ 28 (12th Dist.), quoting *In re S.U.*, 2014-Ohio-5748, ¶ 16 (12th Dist.) ("'Reasonable efforts' does not mean all available efforts"). Given the length of this case and the multiple attempts at reunification, the trial court did not err in finding that the Agency made reasonable efforts to prevent the removal of the children and work towards reunification.

{¶ 22} The first assignment of error is overruled.

**C. The best-interest finding is supported by the evidence**

{¶ 23} The second assignment of error alleges:

{¶ 24} THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE CHILDREN TO THE AGENCY.

{¶ 25} Grandmother next contends that the trial court's best-interest finding to grant permanent custody of the children to the Agency was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 26} "In determining a child's best interest—perhaps the paramount consideration in custody cases—R.C. 2151.414(D)(1) mandates that courts weigh the factors enumerated in the statute. These factors include the child's relationships and interactions, wishes, custodial history, and need for a legally secure placement. R.C. 2151.414(D)(1)(a)-(e)." *In re D.D.*, 2024-Ohio-2769, at ¶ 33. "A court may also consider additional relevant factors in determining a child's best interest." (Citation omitted.) *In re X.S.R.S.*, 2024-Ohio-1636, ¶ 19 (12th Dist.). Our review of the record here reveals that the juvenile court analyzed each of these factors and that its findings are supported by the evidence.

{¶ 27} The trial court found, and the record supports, that the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period, satisfying R.C. 2151.414(B)(1)(d). This finding alone can support an award of permanent custody if it is in the children's best interests. *In re C.W.*, 2004-Ohio-6411, ¶ 21.

{¶ 28} As for the best-interest factors, regarding the children's interactions and interrelationships (R.C. 2151.414[D][1][a]), the trial court noted the children's bond with Grandmother but also highlighted the inappropriate interactions between Grandmother

and Mother that often occurred when they were together. The court conducted in camera interviews with the children, who said they wanted to live with Grandmother. While the court considered the children's wishes to be reunited with Grandmother (R.C. 2151.414[D][1][b]), it balanced this against other factors. The court also considered the custodial history of the children (R.C. 2151.414([D][1][c]), which showed that they had been removed from Grandmother's home three times in the past few years.

{¶ 29} The factor weighed most heavily by the court was its finding that a legally secure permanent placement could not be achieved without granting permanent custody to the Agency (R.C. 2151.414[D][1][d]). The court noted Grandmother's repeated allowance of Mother to live in her home despite the Agency's recommendations against it, Grandmother's inconsistent family support system, and the ongoing issues with the condition of her home. While Grandmother argues she was not given sufficient time to demonstrate her parenting skills without Mother present, the record reveals otherwise. Grandmother made detrimental choices in allowing Mother to repeatedly return to the home. As she had done in the previous proceeding, Grandmother mentioned her support system, but the court noted that the past support had been inconsistent, which suggests that the court gave more weight to the reliability of support over its potential existence. We note that unlike the previous proceeding, no member of Grandmother's support system testified at the permanent-custody hearing.

{¶ 30} While Grandmother asserts her compliance with the case plan, the trial court found ongoing issues with home conditions and her relationship with Mother, both of which are addressed in the case plan. The court focused on whether the underlying issues were resolved, rather than mere compliance with the plan. Ohio courts have consistently held that even substantial compliance with a case plan does not preclude a

grant of permanent custody to a children services agency. *See, e.g., In re C.C.*, 2010-Ohio-780, ¶ 25 (8th Dist.). The focus is on whether the parent has substantially remedied the conditions that caused the child's removal. *In re Shchigelski*, 2000 WL 1568388 (11th Dist. Oct. 20, 2000).

{¶ 31} Here, the evidence demonstrates that despite some progress on the case plan, the fundamental issues that led to the children's initial removal in 2019–unsuitable home conditions and a volatile relationship between Grandmother and Mother–persisted through February 2024. The trial court's determination that Grandmother had failed to remedy these circumstances is supported by clear and convincing evidence. In addition, Grandmother's health has not improved. She was taking 12 different prescription medications, including Suboxone, which according to the prescribing physician "is prescribed for someone who has a history of an opiate use disorder or an opiate dependence." While we recognize that this may not be entirely within her control, it is still a factor that the court properly considered.

{¶ 32} "When assessing evidence, the finder of fact determines witness credibility and assigns weight to their testimony." (Citation omitted.) *In re X.S.R.S.*, 2024-Ohio-1636 at ¶ 35. We see no reason here to disturb the court's assessment of the evidence in this case. Given the evidence, we conclude that the court did not err in determining that it was in the children's best interest to grant permanent custody to the Agency.

{¶ 33} The second assignment of error is overruled.

### III. Conclusion

{¶ 34} In conclusion, the trial court based its decision on a comprehensive assessment of the situation over an extended period, considering factors beyond those emphasized by Grandmother. The court saw Grandmother as overwhelmed by

competing demands on her time and energy. She must balance her own health and well-being, her (detrimental) commitment to Mother, and the needs of the children. As a result, the children lack the consistent, stable, and healthy environment necessary for their well-being. While we recognize the profound impact of terminating parental rights, our role is not to reweigh the evidence or substitute our judgment for that of the trial court, given the deference typically afforded to trial courts in these matters. The record before us contains clear and convincing evidence to support the trial court's findings that the Agency made reasonable efforts to reunify the family and that granting permanent custody to the Agency was in the best interests of the children. Therefore the court's judgment is affirmed.

BYRNE, P.J., and HENDRICKSON, J., concur.